In re GRANT ASSOCIATES, Debtor.

SHAW, LICITRA, PARENTE, ESERNIO & SCHWARTZ, P.C., Appellant & Cross–Appellee,

v.

TRAVELERS INDEMNITY COMPANY, Appellee & Cross–Appellant.

No. 92 Civ. 5468 (LJF).

United States District Court, S.D. New York.

May 16, 1993.

Stuart I. Gordon, Shaw, Licitra, Parente, Esernio & Schwartz, P.C., Garden City, NY, for appellant.

William J. Rochelle, Fulbright & Jaworski, New York City, for appellee.

## OPINION AND ORDER

FREEH, District Judge.

Appellant and Cross–Appellee Shaw, Licitra, Parente, Esernio & Schwartz, P.C. ("Shaw, Licitra") and Appellee and Cross–Appellant Travelers Indemnity Company ("Travelers") each appeal from an order (the "Order") of the Bankruptcy Court (Blackshear, J.) for the Southern District of New York, dated May 22, 1992. The Bankruptcy Court awarded Shaw Licitra attorneys' fees and expenses in the amount of $26,687.50 pursuant to 11 U.S.C. § 506(c) for work performed on behalf of the debtor Grant Associates ("Grant") to the benefit of Travelers and further ordered Shaw, Licitra to return $23,312.50 to Travelers, which was the balance of a $50,000 retainer paid by Grant to Shaw, Licitra.

For the reasons stated at oral argument and below, the Court finds that the Bankruptcy Court did not abuse its discretion in determining the amount due to Shaw, Licitra under § 506(c). Accordingly, the Order is affirmed.

## BACKGROUND

Grant was a limited partnership which owned and operated as its sole asset the Grant Building in Atlanta, Georgia. Grant owed a debt to Travelers in the principal amount of $7,000,000, plus approximately $1,000,000 in interest. Grant's debt to Travelers was confirmed by a Note dated September 17, 1987 (the "Note") and secured by a Deed to Secure Debt, Security Agreement and Assignment of Leases and Rents (the "Deed"). The Deed assigned all rents and deposits from the Grant Building to Travelers and gave Grant a license to collect the rents and hold the deposits. The Deed also stated that the license was revocable upon notice of a default.[1]

In March 1990, Grant ceased making monthly payments under the Note. By letter dated July 3, 1990 (the "Default Notice"), Travelers notified Grant that it was in default under the terms of the Note and Deed and that all applicable cure periods had expired. The Default Notice further notified Grant that its license to collect and hold the rents and deposits generated by the Grant Building was revoked and that Travelers would exercise the power of sale contained in the Deed on the first Tuesday in August 1990.

Before foreclosure could occur, Grant's general partner filed an involuntary petition for bankruptcy in the Bankruptcy Court here in the Southern District of New York which automatically stayed the foreclosure action pursuant to 11 U.S.C. § 362. Grant further petitioned the Bankruptcy Court to be allowed to use the rents and deposits as "cash collateral"[2] for paying the operating expenses of the Grant Building.

In August 1990, Travelers moved to have the Bankruptcy Court either dismiss the

---

1. The Deed, which was filed and recorded in Fulton County Georgia on September 18, 1987, contains an assignment of rents provision which states:

   Grantor hereby sells, assigns, sets over and transfers to Grantee all of the rents, tenant reimbursements, incomes, issues and profits which shall hereafter become due or be paid for the use of the Premises ... and all refunded security and other deposits (hereinafter referred to as the "Deposits") paid to anyone in connection with the occupancy of the Premises or any part thereof (all of which are sometimes hereinafter referred to as the "Rents"), reserving to Grantor a license to collect the Rents and to hold the Deposits only so long as there is no Event of Default, ... said license, upon the occurrence of a continuing Event of Default, to be revocable immediately upon notice to Grantor.

2. "Cash collateral" is defined in 11 U.S.C. § 363(a) as cash or its equivalent in which both the bankruptcy estate and some other entity have an interest. Section 363(c)(2) states that the debtor in possession must obtain the other entity's consent or authorization from the court to use the cash.

Chapter 11 case or terminate the automatic stay and further to declare that the rents and deposits were absolutely assigned to Travelers, giving Grant no interest at all in the rents or deposits. On September 25, 1990 (the "September Judgement") the Bankruptcy Court held that the rents and deposits were the property of Travelers and not the property of Grant or its estate because they were assigned to Travelers in the Deed. The Court also held that Grant's license to collect and use the rents was duly revoked prior to the bankruptcy petition and that Grant had no interest in any rent or deposit.[3]

Grant appealed the September Judgement to the United States District Court for the Southern District of New York. On February 5, 1991 (the "February Decision"), Judge Ward ruled that, even though there had been an absolute assignment of the rents, Grant did retain *"some* sort of interest in the rents, perhaps best characterized as the right to an accounting" (emphasis in the original) and that contrary to the Bankruptcy Court's decision, the rents could be considered cash collateral. The District Court, however, specifically affirmed the Bankruptcy's Court's ruling that Travelers had "perfected" its interest in the rents pre-petition.[4]

On October 1990, the Bankruptcy Court, granted Travelers' motion to terminate the automatic stay pursuant to 11 U.S.C. § 362(d)(1), finding that Grant could not adequately protect Travelers against the decline in value of the Grant Building. However, the Bankruptcy Court withheld lifting the stay for five weeks to give Grant an opportunity to file a plan of reorganization and move to value Travelers'

claim pursuant to 11 U.S.C. § 506(a).[5] Grant, however, failed to act in time and the automatic stay was lifted on December 7, 1990. The December 7 order was upheld by the District Court in the February Decision and, accordingly, the foreclosure of the Grant Building took place on February 5, 1991.

On March 28, 1991, Grant filed a motion (the "Carve–Out Motion") pursuant to Fed. R.Bankr.P. 9024 and Rule 60(b)(5) and (6) of the Federal Rules of Civil Procedure for relief from the September Judgment requesting that the Bankruptcy Court set aside an unspecified amount of rental income from the Grant Building for payment of Shaw, Licitra's fees.

Shaw, Licitra then filed a fee application on April 2, 1991, pursuant to 11 U.S.C. § 330 (the "Fee Application") seeking compensation in the amount of $194,377.50 and reimbursement of expenses in the amount of $14,636.24 for a total of $209,013.74. In the Fee Application, Shaw, Licitra disclosed it had received a retainer in the amount $50,000 from Grant prior to the Bankruptcy filing.[6]

Shaw, Licitra argued that there was $54,-101.86 in unencumbered assets in Grant's estate which were not part of Grant's cash collateral and could be used to pay their fees. This amount represented deposits present in Grant's bank account at the time Travelers notified Grant of its default.

Finally, Shaw, Licitra also filed an application for payment of their fees pursuant to 11 U.S.C. § 506(c) (the "§ 506(c) Application") which contained, among other things, an additional request for a $57,500 "premium". Shaw, Licitra's total request for fees is as follows:

---

3. The September Judgement also provided that Grant's property manager would continue to collect and use the rents on Travelers behalf to pay operating expenses, with the excess being turned over to Travelers. In May 1991, Grant turned over a final sum of $142,669.57 in rents it had been holding.

4. A security interest is "perfected" when the secured party has taken all the requisite legal steps to secure its interest in the subject property against claims by the debtor's creditors. The methods for attaining perfection are stated in

U.C.C. §§ 9–302 through 9–306. *Black's Law Dictionary* 1023–1024 (5th ed. 1979).

5. Section 506(a) states that if the value of the Grant Building was greater than the debt it secured, the value in excess of the debt would be an unsecured asset.

6. Grant's only asset was the Grant Building and thus the retainer necessarily came from the building's rental income. Neither Grant nor Shaw, Licitra has contested this fact or alleged any other source for the retainer.

| Activity [7] | Fee Amount Based on time | Premium |
|---|---|---|
| General Services | $ 18,547.50 | |
| PTC Career Services | 4,615.00 | 57,500.00 |
| Reorganization Plan/§ 506(a) | 9,302.50 | |
| Travelers Litigation | 161,387.50 | |
| Fee Application | 525.00 | |
| | $194,377.50 | $ 57,500.00 |
| Total Compensation | | $251,877.50 |
| Expenses | | $ 14,636.24 |
| TOTAL REQUEST | | $266,513.74 [8] |

On October 3, 1991, the Bankruptcy Court held a hearing to consider *inter alia*, the Fee Application, the Carve–Out Motion, and the § 506(c) Application and thereafter issued an order dated November 8, 1991 allowing and rewarding Shaw, Licitra final compensation and reimbursement of expenses in the amount of $26,687.50 (the "Final Fee Award")—$23,687.50 in fees and $3,000.00 in expenses. Shaw, Licitra then wrote a letter to the Bankruptcy Court requesting a more definite statement.

In December 1991, Travelers filed a motion for the Bankruptcy Court to compel Shaw, Licitra to turn over to Travelers $23,312.50, which was the balance of the $50,000 retainer that Grant had initially paid to Shaw, Licitra. Shaw, Licitra responded with a cross-motion claiming that the Bankruptcy Court intended to award the $26,687.50 in addition to the balance of the $50,000 retainer.

On May 22, 1992 (the "May Decision"), the Bankruptcy Court explained that it had awarded the $26,687.50 "without specific reference to the Retainer, the Carve–Out Motion or the § 506(c) Application." The Bankruptcy Court then found that attor-

neys' fees may not be paid from the property of the estate to the extent the property is subject to a secured interest, except for two exceptions pursuant to § 506(c): (1) if the service for which compensation is sought benefitted the secured creditor, or (2) the secured creditor consents.

The Bankruptcy Court stated that it had "found at the October 3, 1991 hearing that many of the services rendered by Shaw, Licitra resulted in direct and primary benefit to the secured creditor, Travelers." Specifically, the Final Fee Award included "the following services rendered to the benefit of Travelers:

| (1) General Services | $18,547.50 |
|---|---|
| (2) PTC Career Services | 4,615.00 |
| (3) Fee Application | 525.00 |
| Total Fees Awarded | 23,687.50 |
| (4) Disbursements | 3,000.00 |
| Total Awarded | $26,687.50" |

The Bankruptcy Court then found that the $161,387.50 requested by Shaw, Licitra for the "Travelers Litigation" was *not* to the benefit of Travelers. The Bankruptcy Court did not mention the $9,302.50 for the "Reorganization Plan/§ 506(a)" or the $57,-

---

7. *"General services"* includes "preparation of the involuntary Chapter 11 petition [for Grant's general partner], the Schedules and Statements of Affairs and legal advice to the Debtor relative to its obligations to maintain and operate its sole asset, The Grant Building, for the benefit of Travelers, the first mortgage holder." (506(c) Application p. 4)

*"PTC Career Services"* represents work done by Shaw, Licitra to collect $230,000 in rent from a tenant of the Grant Building. Shaw, Licitra claims that it should be awarded 25% as a collection fee instead of just hours billed.

*"Reorganization Plan/§ 506(a)"* is the work done by Shaw, Licitra in preparing a plan of

reorganization and in filing a motion under 11 U.S.C. § 506(a) to value the secured claim of Travelers in order to avoid termination of the automatic stay.

*"Travelers Litigation"* represents Shaw, Licitra's fees for the litigation over the rent and automatic stay referred to above. Finally, *"Fee Application"* is the time billed to file the original Fee Application.

8. Shaw, Licitra never uses this figure in any of its fee applications. It uses the figure of $209,013.74 which does not include the $57,500 premium.

**840**

500 "premium" for the "PTC Career Services". Nor did the Court discuss the issue of whether there were any unencumbered assets in the estate. Finally, the Bankruptcy Court ordered Shaw, Licitra to transfer the $23,312.50 balance of the retainer to Travelers.

Shaw, Licitra appeals claiming that the Bankruptcy Court erred in: (1) finding that Shaw, Licitra should not be compensated for services performed in litigating the nature and extent of Appellee's security interest; (2) in determining that there were no unencumbered assets in the estate; and (3) not making findings of fact and conclusions of law with respect to the unencumbered assets. Travelers cross-appeals claiming that the Bankruptcy Court erred in awarding any fees to Shaw, Licitra and that Shaw, Licitra has no standing.

## DISCUSSION

■ This Court has jurisdiction to hear the instant appeals under 28 U.S.C. § 158(a). Upon an appeal from a bankruptcy court, the district court analyzes the findings of fact under a clearly erroneous standard and conducts a *de novo* review of the conclusions of law. Fed.R.Civ.P. 52(a); Bankruptcy Rule 8013; *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988 (2d Cir.1990). Under the clearly erroneous standard, findings of fact that are supported by evidence may be reversed only if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). If a lower court's findings of fact constitute one of several plausible interpretations, the reviewing court may not reverse merely because it would have adopted an interpretation other than the one adopted by the lower court. A lower court's choice between two permissible views of the facts cannot be held as clearly erroneous. *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511; *United States v. Yellow Cab Co.*, 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949).

### 1. *Pre-notification deposits*

Shaw, Licitra first argues that Travelers did not perfect its security interest in the rents and deposits until Travelers sent Grant the Default Notice. Therefore, according to Shaw, Licitra, those rents and deposits in Grant's possession prior to the Default Notice, which total $54,101.86, are not encumbered by Travelers' security interest and are thus not cash collateral and subject to the requirements of 11 U.S.C. § 506(c). Travelers, on the other hand, argues that Judge Ward previously ruled that Travelers had perfected its interest in all the rents and deposits, including those in Grant's possession prior to the Default Notice. Therefore, according to Travelers, Shaw, Licitra is barred from relitigating this issue.

■ In the February Decision, the District Court decided the issue of whether or not a security interest in the deposits was created by the Deed under Georgia law. In that decision, Judge Ward overruled the Bankruptcy Court's determination that the Deed gave Travelers outright ownership of the rents and deposits and instead found that the rents and deposits were cash collateral. Therefore, the principle of *res judicata* as well as the law of the case doctrine precludes this Court from revisiting that claim. Therefore, all rents and deposits including pre-notification deposits, are "cash collateral" and are not available to pay Shaw, Licitra's fees.

■ Even if the principle of *res judicata* and the doctrine of the law of the case did not bar this Court from deciding this issue, the Court finds that all of the rents and deposits including the pre-notification deposits were cash collateral.

Generally speaking a trustee is able to use rents from property to pay for administrative expenses. 11 U.S.C. § 363(b)(1). A debtor in possession, such as Grant, has the same rights, powers and duties in this regard as would a trustee. *Id.* § 1107(a). "Therefore, under ordinary circumstances, the trustee [or debtor in possession] would be free to use the rents arising from prop-

erty of the estate." *In re Vienna Park Properties*, 976 F.2d 106, 111 (2d Cir.1992).

If the rents or deposits are classified as cash collateral however, the debtor in possession has greater restrictions on their use. *Id.* at 111. As stated earlier, cash collateral is any "cash ... or other cash equivalents ... in which the estate and an entity other than the estate have an interest...." *Id.* § 363(a).

Section 552(b) of the Bankruptcy Code states, among other things, that the existence of another party's interest in the property of the estate is determined by the agreement between the parties and "applicable non-bankruptcy law." *Id.* § 552(b). The Court, therefore, must look to the law of the state where the property is located, in this case Georgia, to determine whether Travelers has perfected a security interest in the rents and deposits. *In re Vienna Park Properties*, 976 F.2d at 112 (citing *Butner v. United States*, 440 U.S. 48, 51–54, 99 S.Ct. 914, 916–918, 59 L.Ed.2d 136 (1979)).

Georgia law, which incorporates U.C.C. §§ 9–302 through 9–306, clearly states that a creditor's interest is perfected when a security agreement has been properly filed. *Enterprises Now, Inc. v. Citizens & Southern Development Corporation.*, 135 Ga.App. 602, 218 S.E.2d 309 (Div. 3 1975). The Deed was filed in 1987, encumbering all rents and deposits of the Grant Building at that time.[9]

### 2. *Section 506(c)*

#### a. *Standing*

■ Travelers contends that Shaw, Licitra has no standing to collect its fees pursuant to § 506(c) because the plain language of § 506(c) only authorizes the trustee (or debtor in possession under § 1107) to use cash collateral for necessary expenses.

It is true that a few bankruptcy courts have held that a service provider like Shaw, Licitra does not have standing under § 506(c). *See In re Kessler, Inc.*, 142 B.R. 796 (W.D.Mich.1992); *Matter of Oakland Care Center, Inc.*, 142 B.R. 791 (E.D.Mich. 1992). These Courts have reasoned that the language of § 506(c) is clear and should be read narrowly, especially given that the provision creates an exception to the rule that expenses not be paid from a secured property. *In re Kessler, Inc.*, 142 B.R. at 799. Furthermore, allowing one unsecured creditor to pursue a claim would unfairly prejudice other unsecured creditors. *Matter of Oakland Care Center, Inc.*, 142 B.R. at 794.

The circuit courts which have ruled on this issue have permitted entities other than the trustee or debtor in possession to seek payment for services rendered, at least under circumstances where the debtor has no motive to pursue the claim. *See In re Palomar Truck Corporation*, 951 F.2d 229 (9th Cir.1991) (debtor had no economic incentive to pursue claim); *Matter of Delta Towers, LTD.*, 924 F.2d 74 (5th Cir.1991) (debtor refused to pursue claim); *In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94 (3rd Cir.1986) (debtor had no reason to pursue the claim). Preventing unsecured creditors from collecting for services which benefitted a secured creditor would give the secured creditor a windfall. *Matter of Delta Towers, LTD.*, 924 F.2d at 77.

Nothing in the record would indicate that Grant has any incentive to pursue a claim on Shaw, Licitra's behalf. Grant has no further assets to protect and thus no continuing need for legal services. Also, the record reveals no other unsecured creditors who might be prejudiced by an award to Shaw, Licitra. The Court, therefore, concludes that Shaw, Licitra has standing to pursue its claim under § 506(c).

---

9. In its Reply Brief, Shaw, Licitra argues that *In re Vienna Park* "clearly stands for the proposition that a secured creditor is *entitled* to the rents *only* when certain *enforcement* steps are taken." (emphasis in original). This misstates the issue. Whether or not a secured creditor can take possession of property is distinct from whether or not it has a perfected security interest in that property. *In re Vienna Park* clearly states that a security interest can be perfected in rents, thereby making them cash collateral, prior to any enforcement of a right to take possession pursuant to that security interest.

b. *Benefit to Travelers*

Section 506(c) states that a trustee, or, as noted above, an unsecured creditor/service provider, "may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of such property to the extent of any benefit to the holder of such claim." 11 U.S.C. § 506(c). "The debtor in possession must ... show that its funds were expended primarily for the benefit of the creditor and that the creditor directly benefited from the expenditure." *In re Flagstaff Foodservice Corp.*, 762 F.2d 10, 12 (2d Cir.1985); *See In re Flagstaff Foodservice Corp.*, 739 F.2d 73, 76 (2d Cir.1984).

As noted above under Rule 8013 of the Federal Rules of Bankruptcy Procedure, findings of fact made by the Bankruptcy Court are reviewed under a clearly erroneous standard. The Bankruptcy Court's findings need only be a plausible interpretation of the record, and if so, this Court will not reverse even if it considers there to be a better interpretation. *See Anderson v. City of Bessemer, N.C.*, 470 U.S. at 573, 105 S.Ct. at 1511.

In its May Decision, the Bankruptcy Court analyzed Shaw, Licitra's fee request under the standard set forth in *In re Flagstaff* and stated it had found that "many of the services rendered by Shaw Licitra resulted in direct and primary benefit to the secured creditor, Travelers." The Bankruptcy Court awarded Shaw, Licitra $26,687.50 in fees and reimbursement of expenses, representing only a portion of a total request of $209,013.74. The award specifically included fees for "General Services" (administration of the Grant Building), "PTC Career Services" (collecting rent from a tenant), and "Fee Application" (Shaw, Licitra's work in filing the original Fee Application), plus $3,000.00 in disbursements. The Bankruptcy Court found that the $161,387.50 in fees for the "Travelers Litigation" (disputing the assignment of rents and automatic stay) did not benefit Travelers. Although Judge Blackshear did not specifically mention the $9,302.50 for the "Reorganization Plan/§ 506(a)" (filing

a plan of reorganization for Grant), since that amount was included in the total request considered and not included in the amount awarded, the Court finds by implication that the Bankruptcy Court found that these services did not benefit Travelers pursuant § 506(c).

Shaw, Licitra contends that the Bankruptcy Court erred in not awarding compensation for "services performed in litigating the nature and extent of Appellee's security interest." Travelers, on the other hand, argues that the Bankruptcy Court erred in granting any fees whatsoever to Shaw, Licitra.

It is undisputed that Grant's only assets were the Grant Building and its rents and deposits. These entire assets were transferred to Travelers. Any service necessary to maintain the value of the building or increase the amount of the rents and deposits would have directly benefited Travelers. However, the "Travelers Litigation" over the rents and automatic stay was only an attempt on Grant's part to forestall the transfer of these assets to Travelers. Filing a reorganization plan and moving to value the asset, "Reorganization Plan/ § 506(a)", were part of Grant's attempted delay. The Bankruptcy Court did not err, therefore, in finding that these services did not benefit Travelers pursuant to § 506(c).

On the other hand, attorneys' fees expended for the administration of the Grant Building and those expended for collecting rents could plausibly have benefitted Travelers. Had the Grant Building not been fully maintained while it was under Grant's control, Travelers would have received something of lesser value than it did upon foreclosure. Likewise, the rent collected from one of the tenants of the Grant Building (PTC Career Services) added to the net sum of rents and deposits turned over to Travelers. Since none of this work would have been done without the possibility of compensation, Shaw, Licitra's fee application could be considered an integral component. Therefore, the Bankruptcy Court also did not err in awarding Shaw, Licitra fees for the "General Services," "PTC Career Services," and "Fee Application."

*c. Premium*

 The United States Supreme Court has held that, in the context of fee-shifting statutes, there is "[a] strong presumption that the lodestar figure—the product of reasonable hours times a reasonable rate—represents a 'reasonable' fee...." *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 565, 106 S.Ct. 3088, 3098, 92 L.Ed.2d 439 (1986). "[T]he overall quality of [counsel's] performance should not be used to adjust the lodestar...." *Id.* 478 U.S. at 566, 106 S.Ct. at 3099. "[S]uch modifications are proper only in 'rare' and 'exceptional' cases...." *Id.* 478 U.S. at 565, 106 S.Ct. at 3098 (citing *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)).

This standard had been adopted by most courts calculating fees under 11 U.S.C. § 330(a). *See In re UNR Industries Inc.,* 986 F.2d 207 (7th Cir.1993); *In re Apex Oil Co.,* 960 F.2d 728 (8th Cir.1992). With respect to the collection of attorney's fees, § 506(c) differs from § 330(a) only in regard to the source of those fees. Section 330(a) uses the language, "reasonable compensation for actual, necessary services ...," 11 U.S.C. § 330(a)(1), while § 506(c) says, "reasonable, necessary costs and expenses ...," 11 U.S.C. § 506(c). Given the similarity in context and language between the two statutes, the same standard should apply for calculating the amount of fees awarded.

The Bankruptcy Court did not directly address the issue of a premium in the May Decision. However, the May Decision explained the award made during the October 3, 1991 hearing in which the matter of a premium for collecting rent from PTC Career Services was extensively discussed. Also, the amount listed for "PTC Career Services" in the May Decision was the actual "lodestar" amount given by Shaw, Licitra. The Court finds, therefore, that implicit in the Bankruptcy Court's award was a finding that there were no circumstances which warranted granting a premium above the "lodestar" figure.

Finally, the record indicates that collecting the rent from PTC Career Services consisted of filing a fairly routine claim in a bankruptcy proceeding. Shaw, Licitra does not claim to have taken any extraordinary action. Rather, they only point to the disparity between the amount collected and the fee awarded. Therefore, under the clearly erroneous standard, the Bankruptcy Court did not err in awarding only the "lodestar" amount for the PTC Career Services fees.

Accordingly, for all the reasons stated above, the Order of the Bankruptcy Court is affirmed.

SO ORDERED.