**In re CALDOR, INC.–NY, The Caldor Corporation, Caldor, Inc.–CT, et al., Debtors.**

**Bankruptcy No. 95 B 44080(JLG).**

United States Bankruptcy Court, S.D. New York.

Oct. 22, 1999.

Kaye, Scholer, Fierman, Hays & Handler, LLP, New York City, for debtors.

Robert E. Michael & Associates, PLLC, New York City, for Pearl–Phil Gmt (Far East) Ltd.

Weil, Gotshal & Manges, LLP, New York City, for Term Loan Holder Committee.

### MEMORANDUM DECISION ON APPLICATION OF PEARL–PHIL GMT (FAR EAST) LTD. FOR ORDER AUTHORIZING AND DIRECTING PAYMENT OF ADMINISTRATIVE EXPENSE CLAIM

JAMES L. GARRITY, Bankruptcy Judge.

Pearl–Phil Gmt (Far East) Ltd. ("Pearl"), one of a group of 18 asian vendors that manufactured goods to the specification of The Caldor Corporation and its debtor affiliates (collectively, "Caldor" or "debtors") during the pendency of these chapter 11 cases, seeks an order allowing as an administrative expense and directing Caldor to pay in full its claim for damages arising from Caldor's repudiation of certain post-petition contracts for the production of merchandise. Debtors, whose estates are administratively insolvent, and a committee consisting of their term loan holders (the "Term Loan Holder Committee") oppose the application. On August 11 and 12, 1999, we conducted an evidentiary hearing on Pearl's application. For the reasons stated herein, we deny it.

## Facts

The facts are not disputed unless noted otherwise. Each debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code on September 18, 1995. They have remained in possession of their assets and businesses since that time pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

Debtors' estates are administratively insolvent. Pursuant to an application dated on or about January 22, 1999, and an order to show cause returnable January 22, 1999, they sought authority to wind-down their businesses in chapter 11 by means of a program intended to effect an orderly liquidation of their businesses while maximizing recoveries on their assets for the benefit of their creditors. In advance of the hearing on the January 22 application, debtors served copies of the application and order to show cause on the committee of creditors appointed herein, Caldor's term debt and real estate lenders, Caldor's post-petition lender, the equity committee appointed herein and the United States Trustee.

On January 22, 1999, we conducted an evidentiary hearing on debtors' application. During that hearing we found that Caldor's creditors would be best served by implementing the proposed program rather than by converting these cases to chapter 7, and we issued an order (the "Wind–Down Order") that, among other things, authorized Caldor to wind down its business operations and affairs, conferred super-priority administrative status upon post-petition claims arising during the wind-down period, and established a bar date for the filing of claims which arose during the post-petition period during which Caldor was operating.

Pursuant to the Wind–Down Order, and to facilitate Caldor's wind-down program, we bifurcated administrative expense claims into "Operating Period" claims (i.e. those that arose between September 18, 1995 and January 22, 1999) and "Wind–Down Period" claims (i.e. those that arose on or after January 23, 1999). In doing so, we in substance conferred super-priority administrative expense status upon Wind–Down Period claims and directed that they be paid in full, and prohibited Caldor from paying Operating Period claims. This prohibition of payment expressly includes payments to "vendors and suppliers for goods and services provided during the Operating Period." Wind–Down Order p. 5.

The Wind–Down Order established March 31, 1999 as the bar date for the filing of all Operating Period proofs of claim (the "Operating Period Claims Bar Date"). In accordance with the terms of the order, Poorman–Douglas Corporation, Caldor's court-appointed claims agent, served the Wind–Down Order, Caldor's January 22, 1999 application, notice of the Operating Period Claims Bar Date and the stay of payments, and a proof of claim form, by mail within ten days of entry of the order, upon all creditors believed by Caldor to hold claims which arose during the Operating Period. Caldor also published notice of the Operating Period Claims Bar Date at least 30 days prior thereto in *Womens' Wear Daily* and *The New York Times*.

Among other things, the Wind–Down Order provided that a hearing would be held on February 5, 1999 to consider Caldor's application for an order approving, among other things, a term debt agreement between debtors and their term lenders, which permitted Caldor to pay ordinary course obligations arising on or after January 23, 1999. The Wind–Down Order expressly provided that, notwithstanding the entry of that order, interested parties could file objections to debtors' January 22 application and the relief granted in the Wind–Down Order no later than three business days prior to the February 5 hearing.

Several parties timely filed objections.[1] At the February 5, 1999 hearing and in accordance with the express terms of the Wind–Down Order, we allowed any party objecting to the relief granted in the Wind–Down Order to be heard, in effect affording them an opportunity to seek relief from the Wind–Down Order, free from the strictures governing a motion for reargument or reconsideration. *See* Transcript of February 5, 1999 Hearing 31:9–14, 36:11–37:5, 41:3–42:7. On February 8, 1999, we issued an order (the "February 8 Order") approving Caldor's application in so far as it concerned the agreement with its term lenders, and reaffirming in all relevant respects the terms of the Wind–Down Order. That order was based upon, among other things, our findings that it is in the best interests of all creditors to liquidate debtors' estates under chapter 11 and that it is unreasonable to expect persons who supply goods and services during the Wind–Down Period to do so without granting them a superpriority status. *See* Transcript of February 8, 1999 Hearing ("2/8 Tr.") 18:8–22. By way of reconsidering the relief granted pursuant to the Wind–Down Order, we considered and overruled each of the objections that were interposed in timely fashion. *Id.* 24:17–21. We predicated our determinations in that regard upon §§ 364(c)(1) and 1112(b) of the Bankruptcy Code.

In accordance with the Wind–Down and February 8 Orders, Caldor implemented a wind-down program involving the sale of store inventory through going-out-of-business sales, and the sale, assignment or disposition of substantially all of its leasehold and fee interests in real estate. It has also terminated all merchandising staff and nearly all employees involved in its import operations. No one disputes that by means of that program Caldor realized significantly more on its assets than it would have realized had these cases been converted to chapter 7 liquidations.

Caldor was party to a Buying Agency Agreement dated April 20, 1990, as amended (the "Buying Agency Agreement"), with Swire and Maclaine Ltd. and Beldare Enterprises, Ltd. (collectively, "Swire"), whereby Swire acted as Caldor's exclusive agent in procuring contracts for the production of goods in Asia. Post-petition, Swire continued in that capacity. Caldor's obligations to Swire under the Buying–Agency Agreement are secured by a stand-by letter of credit (the "Caldor/Swire l/c"). Pearl is one of the asian vendors engaged by Swire on behalf of Caldor during these cases to manufacture goods. Its contracts arise from three purchase orders that Caldor issued post-petition through "worksheets" dated on or about May 28, 1998. Swire communicated these orders to Pearl in purchase advices that it issued between December 17, 1998 and January 8, 1999. In the event of nonpayment under the contracts with Caldor, Pearl had the right to draw on a letter of credit posted by Swire. The purchase orders provided for delivery to Caldor's international freight consolidators, Cargo System USA, Inc. ("Cargo"), in March of 1999, which lead time was customary for goods to be manufactured in Bangladesh. *See* Transcript of August 11–12, 1999 Hearing ("8/11 Tr.") 37:18–22.

Caldor stopped accepting delivery of domestic goods on or about January 5, 1999. It informed Swire of this on January 7, at the same time indicating to Swire that foreign vendors could be told that Caldor's "prospects are uncertain". *Id.* 30:12–17. By a memorandum dated on or about January 12, 1999, Swire's Managing Director Fred Chin instructed Swire personnel to notify foreign vendors to take all steps

---

1. Among them are: the State of Connecticut, Hamilton Beach/Proctor Silex, Inc., Rubbermaid, Inc., the United Food and Commercial Workers Union, Torpedo (1988), Inc., Rafael and Maria Medina, Amroc Investments, Avenel Locksmith, Divine technology International, Sank Enterprises, Equitable Life Insurance Company, New England Power, Earle W. Kazis and Sara Lee Knit Products. Additionally, on February 1, 1999, Fleet Bank, N.A. appealed the Wind–Down Order, but withdrew the appeal on March 18, 1999.

possible to halt production of goods, except goods whose production had proceeded so far that it was too late to stop:

I AM ISSUING THE FOLLOWING GUIDELINES TO ALL OFFICES TO FOLLOW:

1. THE FACT THAT CALDOR HAVE ASKED WHICH OUTSTANDING ORDERS CAN BE CANCELLED APPEARS TO INDICATE LITTLE CHANCE OF OUR STAND-BY L/C BEING INCREASED. UNDER THE CIRCUMSTANCES WE SHOULD ADVISE VENDORS: "CALDOR'S WAREHOUSE HAS STOPPED RECEIVING GOODS FROM DOMESTIC SUPPLIERS AS THEY CANNOT PAY FOR THEM. HOWEVER, THIS DOES NOT APPLY TO OVERSEAS DIRECT IMPORTS ON AN L/C BASIS." (ONLY TELL VENDORS WHAT IS IN QUOTES).

2. "AS CALDOR'S ABILITY TO CONTINUE BUSINESS GOING FORWARD IS MOST UNCERTAIN" (WE CAN TELL VENDORS THIS), THEN OUR ADVICE IS:

—HOLD PRODUCTION ON ANY FALL 99 ORDERS IMMEDIATELY.

—ON SPRING 99 ORDERS, IF GREIGE GOODS OR RAW MATERIAL (IN THE CASE OF HARDLINES) HAS NOT BEEN ORDERED THEN DON'T ORDER. IF GREIGE GOODS HAVE BEEN ORDERED BUT NOT YET DYED UP THEN HOLD. IF PIECEGOODS HAVE BEEN DYED UP BUT NOT YET CUT, DO NOT CUT. IF PIECEGOODS HAVE ALREADY BEEN CUT OR IF GOODS ARE ALREADY BEING SEWN OR MADE UP, THEN OBVIOUSLY ITS TOO LATE TO STOP.

\* \* \* \* \* \*

Between January 13 and 15, 1999, Caldor instructed Swire to cancel all foreign vendor purchase orders which could be canceled without creating "substantial claims." ⁹/₁₁ Tr. 30:19–31:3. Over the next two weeks, Swire was able to cancel in aggregate approximately $5.9 million in purchase orders—$4 million at one time and an additional $1.9 million subsequently. Swire informed Caldor of the cancellations on January 15 and February 3. *Id.* 31:3–8, 122:10–124:25, 211:12–19, 214:6–13; April 26, 1999 Deposition of Fred Chin 162:24–163:21. Approximately $6 million in orders could not be canceled without giving rise to damage claims. *Id.* 206:3–12.

On or about January 18, 1999, Caldor instructed Cargo to stop accepting deliveries of finished goods from foreign vendors. It rescinded that instruction two days later, and, after January 20, 1999, continued to accept delivery of foreign vendor merchandise as to which production had already been completed. Swire informed Pearl of the recission of the order on or about February 19. ⁹/₁₁ Tr. 31:19–22. Caldor's Senior Vice President and General Counsel, Bennett S. Gross ("Gross"), testified that Caldor rescinded the order with respect to vendors serviced through Swire because Caldor wished to avoid a situation where it did not receive goods but in effect was forced to pay for them by virtue of a draw on the Caldor/Swire l/c. *Id.* 100:10–109:6.

On January 21, 1999, the day before we issued the Wind–Down Order, Chin transmitted the following memorandum to Swire personnel for communication to vendors:

CALDOR HAVE INSTRUCTED CARGO SYSTEM TO START ACCEPTING POs FROM SWIRE AS PER THE LISTING I FAXED TO BENNETT GROSS DATED 990119 OF WHICH YOU ALL HAVE A COPY. JOE CHAN OF CARGO SYSTEM HK HAS JUST CONFIRMED HE IN TURN IS INSTRUCTING ALL THEIR OFFICES TO IMMEDIATELY START RECEIVING GOODS AGAIN. PLEASE ACT ACCORDINGLY.

SHOULD YOU HAVE ANY PROBLEMS, PLSE LET ME KNOW.

\* \* \* \* \* \*

I feel it important to stress to all offices that despite Cargo System accepting goods again, this does not mean that we should encourage vendors with POs which cannot be cancelled to go ahead and ship. There is still a high risk factor in shipping, even if they have a Swire l/c, because if they ship and Caldor announces liquidation, there is the likelihood not only will they not be paid, but they may also lose their goods as well. Under the circumstances, Swire cannot pay a vendor until we are paid by Caldor. This was made very clear to all offices in my memo of 990119 and is still applicable in spite of the above notification. Caldor confirmed to me this morning they are still reviewing orders where vendors may be able to accept cancellation with some compensation, and will advise us of their decision shortly. I remind you that Caldor has formally requested us to "CANCEL ANY ORDERS WHICH CAN BE CANCELLED WITHOUT CREATING SUBSTANTIAL CLAIMS BY THE SUPPLIERS".

There is no direct evidence, however, that Swire personnel communicated those instructions to Pearl.

On February 16, 1999, Caldor's Director of Imports, Joseph J. Mazzola, instructed Swire to inform foreign vendors that they were not to undertake any further efforts to produce goods covered by purchase orders that Caldor had placed prior to January 22, 1999. Caldor reiterated that instruction in a February 17, 1999 letter from Gross to Swire's counsel instructing Swire to cancel immediately all outstanding purchase orders and stating that Caldor was simultaneously instructing its freight consolidators to stop accepting shipments from vendors. Swire informed Pearl of the cancellation on February 22, 1999.

As noted, the Wind–Down Order established March 31, 1999 as the Operating Period Claims Bar Date. Because Caldor never dealt directly with its foreign vendors, on January 28, 1999, it asked Swire to prepare a list of their names and addresses. On February 1, 1999 Swire gave the list to Caldor and on that day, Caldor caused Poorman–Douglas to serve Pearl by mail with notice of issuance of the Wind–Down Order and a proof of claim form. Pearl's manager, Li Wai Yiu, maintains that Pearl received those materials on March 1, 1999.[2] However, Swire informed Pearl of the cancellation on February 22, 1999. *Id.* 38:2–7. Pearl mitigated its damages by means of an agreement between Verity Enterprises Limited, a Swire affiliate, and Rose's Stores, Inc. Thus, of the $54,685.74 originally due under the purchase orders from Caldor, Pearl claims that it is entitled to be paid $22,605.72 as a Wind–Down Period expense. Pearl did not file a proof of claim for damages arising from Caldor's cancellation of its purchase orders. Pursuant to a stipulation we approved on July 12, 1999 (the "July 12 Stipulation"), Pearl and Caldor have agreed to the amount of Pearl's claim, but Caldor expressly "reserve[d] the right to challenge the priority and/or treatment of" Pearl's claim. *See* July 12 Stipulation p. 2.

Pearl's application is one of approximately 18 filed by Caldor's foreign vendors in the aftermath of the entry of the Wind–Down Order.[3] On May 13, 1999, we deter-

---

**2.** Apparently, because of the Chinese New Year, Pearl would not have been in a position to receive correspondence between February 16 and February 21, and perhaps as late as March 1. *Id.* 34:22–35:2.

**3.** Those vendors are: Garfit Fashion Industrial Co., Ltd., Samkoo Corp., Lih Shyuan Enterprises Co., Ltd., Jung Hwa Korea Co., Ltd., Febena Fashion Co., Ltd., Suy Co., Ltd., Eng's Willie Textile Ltd., Noble Grade limited, Stylo Apparels Inds., Ltd., Russell Garments, Maxlin Garments SDN.BHD, Rishal Garments Ltd., Tania Knit, Ltd., Maxim Ltd., Makalot Industrial Co., Ltd., King Star Garment Hon-

mined that the interests of those parties and Caldor would be best served by proceeding with the claims of a single vendor as a test case.

### Discussion

We have subject matter jurisdiction of this contested matter under 28 U.S.C. §§ 1334(b) and 157(a) and the July 10, 1984 Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (Ward, Acting C.J.). This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(B).

■ Caldor concedes that Pearl's claim is entitled to administrative expense priority under §§ 503(b)(1)(A) and 507(a)(1) of the Bankruptcy Code.[4] Pearl contends that it is not bound by the Wind–Down Order and that, as such, Caldor must pay its claim in full, because it did not receive notice of that order or otherwise have an opportunity to contest it, and because we cannot lawfully prefer Wind–Down Period claims over Operating Period claims. Alternatively, Pearl contends that even if it is subject to the Wind–Down Order, Caldor must pay its claim in full in accordance with the February 8 Order as a Wind–Down Period claim. We address those issues below.

The Due Process Clause of the Fifth Amendment states, in part, that "[n]o person shall be ... deprived of life, liberty or property without due process of law". U.S. CONST. amend. V. Pearl contends, and debtors and the Term Loan Committee do not dispute, that its rights under state law to recover breach of contract damages against debtors arising from their cancellation of the purchase orders are inchoate property rights within the contemplation of the Due Process Clause, which have been diminished in value by entry of the Wind–Down Order. Pearl contends that if we enforce the Wind–Down Order we will violate its due process rights because Caldor did not notify it of the January 22 hearing or give it adequate notice of the February 5 hearing.

■ To satisfy the Due Process Clause, a party must be given "notice reasonably calculated, under all the circumstances, to apprise [it] of the pendency of the action and afford [it] an opportunity to present [its] objections." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted). Thus, in assessing the merits of Pearl's argument, we consider whether Caldor acted reasonably in sending it notice of the proceedings that resulted in entry of the Wind–Down Order and the February 8 Order, not whether Pearl actually received that notice before we entered the orders. *Weigner v. City of New York*, 852 F.2d 646, 649 (2d Cir.1988), *cert. denied*, 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989). While Caldor concedes that it did not give Pearl notice of the January 22 hearing, it denies that Pearl's due process rights have been violated. It says that the form of notice was adequate and correctly notes that in the Wind–Down Order we found it to be "sufficient and accurate". It contends that given the exigencies of the case, and in light of the fact that it sent copies of the notice

---

duras S. de R.L. and Welcome Textile Industries Pte Ltd.

4. Caldor initially argued that Pearl's claim is not entitled to administrative priority treatment under the Bankruptcy Code because it did not benefit from Pearl's performance under the purchase agreements. Pearl denied that the "benefit" to Caldor's estate is relevant in assessing whether its claim merits administrative expense priority since Caldor entered into and breached the purchase agreements post-petition. It also argued that

Caldor is estopped by the July 12 Stipulation from denying that its claim is an administrative expense priority claim. However, during the hearing on this motion, Caldor conceded that Pearl's claim is entitled to administrative expense priority status. *See* ⅝₁ Tr. 271:4–8. Thus, we need not consider the effect of the July 12 Stipulation or any other matter raised by Pearl in support of its assertion that it holds an administrative expense priority claim against Caldor.

to almost 35,000 entities, both domestic and foreign, service of the notice on Pearl by regular mail on February 1 was adequate. For Caldor, this is especially so, in light of the fact that at its request, Swire provided it with the names and addresses of the foreign vendors on February 1 and Caldor sent them the notice the same day.[5]

■ Even if a party is not afforded prior notice, a subsequent finding against it on the merits of the underlying litigation can overcome its objection on due process grounds. *See Towers v. City of Chicago,* 173 F.3d 619, 629 (7th Cir.1999) (fines imposed on motor vehicle owners following discovery of illegal drugs or unregistered firearms in their vehicles, even when vehicles were driven by others, would not be set aside on grounds that failure to provide for direct notice to owners of availability of hearing within 24 hours of seizure of vehicle violated their procedural due process rights; assuming there was due process violation there was no prejudice, since hearings would have established validity of vehicle seizure and imposition of fine), *cert. denied,* —— U.S. ——, 120 S.Ct. 178, —— L.Ed.2d —— (1999). Thus, in addition to establishing that the means of notification employed by Caldor was inadequate, Pearl must demonstrate that it was prejudiced because it did not receive adequate notice. *See Rapp v. U.S. Dept. of Treas., Office of Thrift Supervision,* 52 F.3d 1510, 1520 (10th Cir.1995); *Brock v. Dow Chemical U.S.A.,* 801 F.2d 926, 930–31 (7th Cir. 1986); *In re Bleaufontaine, Inc.,* 634 F.2d

1383, 1387 n. 5 (5th Cir.1981); *Savina Home Indus., Inc. v. Secretary of Labor,* 594 F.2d 1358, 1365 (10th Cir.1979); *Continental Casualty Co. v. General Development Corp. (In re General Development Corp.),* 165 B.R. 685, 688 (S.D.Fla.1994); *In re Vanguard Oil & Service Co.,* 88 B.R. 576, 580 (E.D.N.Y.1988).

Pearl has not established that it was prejudiced in any way because irrespective of what transpired prior to entry of the Wind–Down and February 8 Orders, we gave Pearl the opportunity to contest entry of those orders on any basis during the course of the hearing on this motion. It chose to assail only the legal underpinnings of those orders.[6] In that regard, Pearl contends that we violated the Due Process Clause when we entered the Wind–Down Order because in doing so, we engaged in "judicial law making" by affording Caldor rights only available under § 365 of the Bankruptcy Code. Section 503(b) of the Bankruptcy Code provides in relevant part that "the actual, necessary costs and expenses of preserving the estate" shall be allowed as administrative expenses. 11 U.S.C. § 503(b)(1)(A). Allowed administrative expense claims have first priority of payment under § 507(a)(1). *See* 11 U.S.C. § 507(a)(1). If on January 22, 1999, we converted these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code, Pearl's claim would be paid pro rata with all other allowed administrative claims arising during the chapter 11 cases. *See* 11 U.S.C. § 726(b);[7] *Musso*

---

5. During all relevant times, Pearl's counsel of record herein represented Swire in its dealings with debtors. Caldor contends that because it notified Swire, through counsel, of the matters relating to the entry of the Wind–Down Order, that notice was effective as to Pearl and the other vendors. However, counsel denies that he was representing those vendors at that time, and Caldor has not established that he was.

6. Pearl did not attempt to elicit testimony or produce other evidence refuting any factual finding that we made in entering those orders.

7. Section 726(b) provides as follows:

Payment on claims of a kind specified in paragraph (1), (2), (3), (4), (5), (6), (7), or (8) of section 507(a) of this title, or in paragraph (2), (3), (4), or (5) of subsection (a) of this section, shall be made pro rata among claims of the kind specified in each such particular paragraph, except that in a case that has been converted to this chapter under section 1009, 1112, 1208, or 1307 of this title, a claim allowed under section 503(b) of this title incurred under this chapter after such conversion has priority over a claim allowed under section 503(b) of this title incurred under any other chapter of

*v. Brooklyn Navy Yard Development Corp. (In re Brooklyn Navy Yard Development Corp.)*, 207 B.R. 391, 402 (Bankr. E.D.N.Y.1997). We determined to permit debtors to liquidate in chapter 11 because, among other things, the time and expense attendant to replacing incumbent management with a chapter 7 trustee (and his own professionals) will further diminish these already administratively insolvent estates. We created the distinction between Operating and Wind–Down Period claims because creditors would not have agreed to extend credit to Caldor during the Wind–Down Period knowing that they would not be paid in full.

■ Pearl is correct that the Constitution vests Congress, not the judiciary, with the right to "establish ... Laws on the subject of Bankruptcies throughout the United States." U.S. CONST. Art. I § 8. However, we disagree that § 365 is relevant or that in entering the Wind–Down Order we engaged in judicial law making. Pursuant to § 364(c), if a debtor-in-possession or trustee is unable to obtain unsecured credit as an administrative expense, we may authorize it do so "with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b)". 11 U.S.C. § 364(c)(1). During the evidentiary hearing that we conducted on Caldor's application for the issuance and entry of the Wind–Down Order, Caldor proved that because debtors' estates are administratively insolvent, no third party would provide services or extend credit to them except on a super-priority basis. *See* Transcript of January 22, 1999 Hearing 23:12–25, 60:4–8. We understand that we cannot accord claims priority

treatment that is not otherwise provided for under the Bankruptcy Code. *See In re Microvideo Learning Systems, Inc.*, 232 B.R. 602, 607 (Bankr.S.D.N.Y.1999) (and cases cited therein). We have not done so in this case because our actions are grounded in §§ 105(a), 364(c)(1) and 1112(b) of the Bankruptcy Code.[8]

■ During argument of this motion, Pearl maintained that the Wind–Down Order runs afoul of Fed.R.Bankr.P. 4001 because debtor did not give 15 days notice of the hearing on the application for that order.[9] Debtor did not strictly comply with the notice provisions of Rule 4001(c). However, as we have noted, to the extent that Pearl was denied a right to be heard on that matter, we have now given it the opportunity to contest all of the legal and factual predicates to the relief that we granted in the Wind–Down Order. Given the unique exigencies of the case, Caldor's dire need to obtain credit during the Wind–Down Period and the benefit to all Operating Period creditors from the implementation of the procedures in the Wind–Down Order (all of which was established on the record of the January 22 and February 5 hearings, and none of which has been challenged by Pearl), debtors' failure strictly to comply with Rule 4001 does not invalidate the order.

The approach which we have taken is not without some precedent. In *Nostas Associates v. Costich (In re Klein Sleep Products, Inc.)*, 78 F.3d 18 (2d Cir.1996), our court of appeals found that a landlord's claim for future rent arising from a chapter 11 trustee's post-petition rejection of a lease that had previously been assumed by

this title or under this chapter before such conversion and over any expenses of a custodian superseded under section 543 of this title.
11 U.S.C. § 726(b).

8. Because we find that the Wind–Down Order is directly supported by provisions of the Bankruptcy Code, Pearl's argument that we lacked jurisdiction to issue the Wind–Down Order pursuant to *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S.

50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), is meritless.

9. In part, Rule 4001 states that a motion for authority to obtain credit shall be made in accordance with Fed.R.Bankr.P. 9014 as a "contested matter", and that we may not commence a final hearing on any such motion earlier than 15 days after service of the motion. *See* Fed.R.Bankr.P. 4001(c).

the debtor-in-possession was entitled to administrative priority status. *Id.* at 30. Although the issue was not raised on appeal, Bankruptcy Judge Conrad established precisely the same kind of demarcation between administrative claims against the administratively insolvent estate arising during the period during which the debtor was operating and "burial expenses" incurred during the wind-down period. *See id.* at 21; *In re Klein Sleep Products, Inc.*, 173 B.R. 296, 297–98 (S.D.N.Y.1994) (affirming bankruptcy court order allowing in part landlord's super-priority administrative claim for unpaid rent accruing during wind-down period, allowing landlord's administrative claim for unpaid rent accrued during operating period, allowing landlord's claim for future rent but only as a general unsecured claim subject to the § 502(b)(6) limitation, and disallowing the landlord's claims for attorneys' and brokerage fees), *rev'd in part and remanded,* 78 F.3d 18 (2d Cir.1996). Like Judge Conrad in *Klein Sleep,* we determined that it was in the best interests of all parties concerned to facilitate the liquidation of these estates in the way best calculated to maximize recoveries to all creditors.[10]

■ Having determined that we did not violate the Due Process Clause in entering the Wind–Down and February 8 Orders, we address Pearl's alternative argument. Pearl says that Caldor must pay its claim in full according to the express terms of the February 8 Order,[11] because the claim arose on or about February 22, 1999, when Caldor canceled the purchase orders. It also contends that the claim is entitled to Wind–Down status because Caldor induced it to produce goods during the Wind–Down Period.

Pearl asserts that under state law, its claim did not arise until Caldor canceled the purchase agreements. Thus, it says that upon execution of the purchase orders (during the Operating Period), it merely held a contingent administrative priority claim against Caldor, and that the Bankruptcy Code does not recognize "contingent" administrative priority claims because it is "axiomatic" that a contingent right to payment cannot give rise to an "actual" expense within the meaning of § 503(b)(1)(A) of the Bankruptcy Code.[12] We disagree with the underlying premise of Pearl's argument.

■ As relevant here, § 101(5) of the Bankruptcy Code defines "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured". 11 U.S.C. § 101(5)(A).[13] The term "claim" is "sufficiently broad to encompass any possible right to payment." *Mazzeo v. U.S. (In re Mazzeo),* 131 F.3d 295, 302 (2d Cir.1997) (citing *Ohio v. Kovacs,* 469 U.S. 274, 279, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985); *In re*

10. Even assuming, *arguendo,* that the Wind–Down Order is void on due process grounds, Pearl is not entitled to full payment of its administrative priority claim. Eliminating any bifurcation of administrative claims against these administratively insolvent estates would mean that all administrative claimants would receive their pro rata share of whatever funds were available for distribution to administrative creditors, rather than payment in full.

11. In part, that order directs debtors to "pay, in the ordinary course, any and all obligations arising in the ordinary course on or after January 23, 1999" which are not subject to bona fide dispute.

12. Section 503(b)(1)(A) confers administrative priority status on "the actual, necessary costs and expenses of preserving the estate". 11 U.S.C. § 503(b)(1)(A).

13. We understand Pearl to argue that § 101(5)(B) is relevant here. That subsection provides that a "claim" also encompasses the "right to an equitable remedy for breach of performance if such breach gives rise to a right to payment". Pearl is not seeking any equitable remedy in connection with Caldor's breach of the purchase orders. Thus, § 101(5)(B) is inapplicable in determining whether and at what point it had a "claim" under federal bankruptcy law.

*M. Frenville Co., Inc.,* 744 F.2d 332, 336 (3d Cir.1984), *cert. denied,* 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *In re Kennise Diversified Corp.,* 34 B.R. 237, 244 n. 6 (Bankr.S.D.N.Y.1983); *In re Vasu Fabrics, Inc.,* 39 B.R. 513, 517 (Bankr. S.D.N.Y.1984); *In re Johns–Manville Corp.,* 36 B.R. 743, 754 n. 6 (Bankr. S.D.N.Y.1984), *aff'd,* 52 B.R. 940 (S.D.N.Y. 1985); *In re Barnett,* 42 B.R. 254, 257 (Bankr.S.D.N.Y.1984); *In re Smith Jones, Inc.,* 26 B.R. 289, 293 (Bankr.D.Minn. 1982)); *see also Pennsylvania Dep't of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990) (noting that Congress chose expansive language in definitions of both "claim" and "debt"). The drafters defined that term broadly to ensure that "all those with a potential call on the debtor's assets, provided the call in at least some circumstances could give rise to a suit for payment … come before the reorganization court so that those demands can be allowed or disallowed and their priority and dischargeability determined." *King's Terrace Nursing Home and Health Related Facility v. New York State Department of Social Services (In re King's Terrace Nursing Home and Health Related Facility),* 184 B.R. 200, 204 (S.D.N.Y.1995) (citing *In re Chateaugay Corp.,* 944 F.2d 997, 1003, 1008 (2d Cir.1991)).

▮▮▮▮ The Bankruptcy Code does not define the term "contingent". A claim is "contingent" when the debtor's legal duty to pay it does not come into existence until triggered by the occurrence of a future event. *See Mazzeo,* 131 F.3d at 303 (citing 2 COLLIER ON BANKRUPTCY ¶ 109.06[2][b] (15th ed. rev.1997)). Contrary to Pearl's suggestion, neither the Bankruptcy Code nor caselaw construing it prohibits contingent administrative claims. To the contrary, whenever an entity provides goods or services to a trustee or debtor-in-possession, it has a contingent administrative claim. *See, e.g., Chiang v. Barclays Bank, PLC (In re Caledonia Springs, Inc.),* 185 B.R. 712, 717 n. 19 (D.VI.1995) ("Barclays is a creditor of CSI's estate, holding contingent priority administrative claims for its fees and costs incurred post-petition, and contingent unsecured claims for prepetition costs and fees"); *U.S. v. Brandt (In re Lissner Corp.),* 119 B.R. 143, 147–48 (D.Ill.1990) (noting that in case converted from chapter 11 to chapter 7, pre-conversion administrative expense claims are contingent until conversion, at which time they become definite and readily ascertainable). The case relied upon by Pearl, *Juniper Development Group v. Kahn (In re Hemingway Transport, Inc.),* 993 F.2d 915 (1st Cir.1993), *cert. denied,* 510 U.S. 914, 114 S.Ct. 303, 126 L.Ed.2d 251 (1993), is not to the contrary.[14] It merely reinforces the principle that a post-petition claim that is still contingent will not be "allowed" under § 503(b) of the Bankruptcy Code and paid as an administrative expense. Pearl had a contingent administrative

---

**14.** In *Hemingway,* the post-petition purchaser of contaminated real property commenced an adversary proceeding after the debtor's case was converted to chapter 7 seeking indemnification for response costs incurred under CERCLA. The bankruptcy court initially ruled that its claims were entitled to administrative expense priority, but subsequently disallowed the purchaser's claim for future response costs. After the district court affirmed, the court of appeals held, among other things, that CERCLA claims are not exempt from disallowance under § 502(e)(1)(B) as contingent claims for reimbursement or contribution, the purchaser's claims for past and future response costs would be entitled to administrative priority if the purchaser satisfied the statutory definition under CERCLA, and past response costs were entitled to administrative expense status. *Id.* at 922–34. As relevant here, it noted as follows:

> [W]e agree that Mammoth Mart priority is unavailing to Juniper insofar as its right to contribution for future response costs remains "contingent" at the time the bankruptcy court considers Juniper's claim for allowance against the estate. Only "actual" administrative expenses, not contingent expenses, are entitled to priority payment under Bankruptcy Code § 503(b)(1)(A).

*Id.* at 930 (discussing *Cramer v. Mammoth Mart, Inc. (In re Mammoth Mart, Inc.),* 536 F.2d 950 (1st Cir.1976)).

claim when Caldor executed the purchase orders. That claim would have remained contingent until Pearl completed performance under the purchase orders or either party breached them, at which time the amount of Pearl's claim, if any, would have been liquidated. Thus, we reject Pearl's argument that it did not have a claim at the time that Caldor entered into a contract with it because the Code prohibits contingent administrative claims.

 Because contingent and unmatured rights of payment are "claims" under the Bankruptcy Code, a right to payment that is not yet enforceable under non-bankruptcy law may be defined as a claim within section 101(5)(A) of the Bankruptcy Code. *Kilbarr Corp. v. General Servs. Admin. Office (In re Remington Rand Corp.)*, 836 F.2d 825, 827 (3rd Cir. 1988) (claim deemed to arise when government had requisite knowledge of its right to payment based on breach of contract even though claim had not accrued under Contract Disputes Act of 1978); *Federated Dept. Stores, Inc. v. Wongco (In re R.H. Macy & Co., Inc.)*, 236 B.R. 583, 589 (Bankr.S.D.N.Y.1999) (causes of action for breach of lease constituted contingent, unmatured rights to payment and, thus, were claims discharged by debtor's plan and confirmation order); *see also U.S. v. Schottenstein, Zox & Dunn (In re Unitcast, Inc.)*, 219 B.R. 741, 746 (6th Cir. BAP 1998) (" '[T]he proper standard for determining [a] claim's administrative priority looks to when the acts giving rise to [the] liability took place, not when they accrued' ") (quoting *PBGC v. Sunarhauserman, Inc. (In re Sunarhauserman, Inc.)*, 126 F.3d 811, 818 (6th Cir.1997)); 2 COLLIER ON BANKRUPTCY ¶ 101.05[1] at p. 101–26 (15th ed. rev.1999). In accordance with this principle, contract-based claims arise at the time the contract is entered into, rather than upon the occurrence of subsequent events such as termination. *See In re Chateaugay Corp.*, 102 B.R. 335 (Bankr. S.D.N.Y.1989) (" '[w]here the debtor's obligations stem from contractual liability, even a post-petition breach will be treated as a prepetition liability where the contract was executed prepetition' ") (quoting *In re Chateaugay Corp.*, 87 B.R. 779, 796 (S.D.N.Y.1988), *aff'd on other grounds sub nom. Pension Benefit Guaranty Corp. v. The LTV Corp.*, 875 F.2d 1008 (2d Cir. 1989), *rev'd on other grounds*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990)); *In re Riodizio, Inc.*, 204 B.R. 417, 424 n. 6 (Bankr.S.D.N.Y.1997) (postpetition breach of a prepetition contract gives rise to only a prepetition claim); *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group Inc.)*, 138 B.R. 687, 696 n. 12 (Bankr.S.D.N.Y. 1992) (same). This is so because

> [i]t is within the fair contemplation of parties entering into a contract that the other party may breach it, or have made representations to induce the making of the contract. Thus, a contingent claim arises at that point, although it may never mature.

*In re Russell*, 193 B.R. 568, 571 (Bankr. S.D.Cal.1996); *accord Chateaugay*, 944 F.2d at 1004 ("the Code's inclusion of 'unmatured' and 'contingent' claims is usually said to refer to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship was created' "). Accordingly, a "creditor need not have a cause of action that is ripe for suit outside of bankruptcy in order for it to have a pre-petition claim for purposes of the Code." *In re National Gypsum Co.*, 139 B.R. 397, 405 (N.D.Tex.1992); *accord In re Symes*, 174 B.R. 114, 118 (Bankr. D.Ariz.1994) (mere fact that creditor "may hold a contingent right to payment until filing the petition does not mean [the creditor] holds a post-petition claim. Holding otherwise ... ignores the plain meaning of the statutory definition of claim and debt").[15]

 Notwithstanding the forgoing, Pearl maintains that its "claim" only came

---

15. Although Caldor no longer contends that

Pearl's claim does not merit administrative

into existence when Caldor canceled the purchase orders because in accordance with *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), we must apply state law to determine when its claim arose. However, while non-bankruptcy law governs the existence of a claim, the Bankruptcy Code governs when a claim arises. *See Siegel v. Federal Home Loan Mortgage Corp.*, 143 F.3d 525, 532 (9th Cir.1998); *R.H. Macy*, 236 B.R. at 589 (citing *LTV Steel Co., Inc. v. Shalala (In re Chateaugay Corp.)*, 53 F.3d 478, 497 (2d Cir.1995); *National Gypsum*, 139 B.R. at 405); *In re Gonzalo*, 169 B.R. 13, 15 (Bankr.E.D.N.Y.1994); *In re Turner*, 101 B.R. 751, 754 (Bankr.D.Utah 1989).[16]

Despite Pearl's efforts to characterize this circuit's construction of the law as having evolved in a way favorable to its position, courts in this circuit have consistently held that contract-based claims arise under federal bankruptcy law when the contract is entered into. *See Riodizio*, 204 B.R. at 424 n. 6; *Drexel*, 138 B.R. at 696 n. 12; *Chateaugay*, 102 B.R. at 351.[17] That general principle was augmented by our court of appeals in *Chateaugay*, 944 F.2d at 1004, a case which did not involve a contract-based claim, when it added the gloss that the event which gives rise to the claim must have been "'within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created'" (quoting *In re All Media Properties, Inc.*, 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir.1981));[18] *see also Big Yank*, 139 F.3d at 328 (finding that the

priority status under the Bankruptcy Code, decisions addressing whether a claim is an administrative claim as opposed to a pre-petition general unsecured claim are instructive because they illustrate the general principle under federal bankruptcy law that a "claim" arising from a contract comes into existence prior to the occurrence of a breach.

**16.** To show that other courts have adopted the Erie doctrine in determining when a claim arises for purposes of the Bankruptcy Code, Pearl cites to *Frenville*, 744 F.2d at 332, wherein the court held that third-party claims for non-contractual contribution and indemnity filed after the date of a chapter 11 petition are post-petition claims, even though based on facts occurring pre-petition, if under state law the third-party claims may not be pleaded until the third-party plaintiff has been sued by the primary plaintiff and if the primary suit is filed post-petition. To our knowledge, *Frenville* has never been followed in this circuit. My colleague, the Honorable Burton R. Lifland expressly rejected it in *In re Johns–Manville Corp.*, 57 B.R. 680, 689 (Bankr.S.D.N.Y.1986), and the law in this circuit and elsewhere is otherwise. *See R.H. Macy*, 236 B.R. at 589 (citing *Chateaugay*, 53 F.3d at 497; *National Gypsum*, 139 B.R. at 405); *Gonzalo*, 169 B.R. at 15; *Turner*, 101 B.R. at 754.

**17.** Pearl attempts to distinguish Judge Lifland's decision in *Chateaugay* on the basis that the case involved an indemnity rather than a contract for the sale of goods. We disagree. Like a party to a sale contract, a party to an indemnification agreement obligates himself upon executing the agreement to perform in accordance with its terms, subject to the occurrence of certain conditions subsequent. The only difference is that whereas a sale contract is normally a two party agreement, an indemnity agreement typically involves three parties. We do not find that to be a material distinction. Because Pearl's claims are based upon a contract, cases relied upon it which address when other kinds of claims arise are largely inapposite. *See, e.g., Big Yank Corporation v. Liberty Mutual Fire Insurance Co. (In re Water Valley Finishing, Inc.)*, 139 F.3d 325 (2d Cir. 1998) (addressing whether claims based upon court imposed sanctions arose pre-petition); *Chateaugay*, 944 F.2d at 997 (EPA's claim for environmental response costs under CERCLA); *Chateaugay*, 87 B.R. at 795–96 (PBGC statutory claims for amounts due to employees based upon services provided pre-petition).

**18.** This proviso is entirely understandable when one considers, for example, that a party who contracted with the debtor prior to bankruptcy to purchase goods is injured because during the bankruptcy case the goods were only partially delivered, and those that were delivered caused physical injury to the buyer because they were defective. The damages arising from breach of the contract would be treated as having arisen pre-petition because breach was in the actual contemplation of the parties. The product liability claim would be a post-petition claim because it was not con-

applicable question in determining when claim based upon court-ordered sanctions arose is "whether a claim for yet-to-be-awarded sanctions can be deemed to arise prepetition if the possibility of the claim was within the contemplation of the parties").[19]

Based upon the Supreme Court's ruling in *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 559, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990), that "a 'right to payment' is nothing more nor less than an enforceable obligation", Pearl maintains that it did not have a "claim" until after the Operating Period when Caldor breached the contract because Pearl did not possess an enforceable obligation under applicable state law until that time. That reliance is misplaced because the issue here is not merely whether Pearl had a "right to payment" during the Operating Period, but whether Pearl had a

"claim" within the meaning of § 101(5). As noted, 101(5) defines the term claim to encompass a "right to payment" which is "unliquidated", "contingent" or "unmatured". As such, the right to payment need not be *presently* enforceable to qualify as a claim. *Davenport* does not hold otherwise. In addition, as noted previously, federal rather than state law determines when Pearl's claim arose.[20]

Pearl also argues that it was not in the fair contemplation of the parties in July of 1998 that eight months later Caldor would summarily cancel the purchase orders as part of a sudden, total and unexpected liquidation. The parties to a contract clearly anticipate that it may be breached at some point in the future. *See Russell*, 193 B.R. at 571. Pearl cites no authority for the proposition that they must anticipate the specific reason for the breach. We are aware of none.

templated by the parties at the time they entered into the contract.

**19.** Judge Lifland recently acknowledged the Second Circuit's gloss on the test in *Riverwood International Corp. v. Olin Corp. (In re Manville Forest Products Corp.)*, 225 B.R. 862 (Bankr.S.D.N.Y.1998), when he wrote

*LTV* provides a bright line test for determining whether a contractual contingency claim accrued. Was this a pre-petition obligation of the Debtor that will become due upon the happening of some future event? Was the future event within the actual or presumed contemplation of the parties at the time the original relationship was created?

*Id.* at 866–67. Pearl claims that *Riverwood* is the latest step in Judge Lifland's evolution away from his erroneous pronouncement in *Chateaugay*, and that the former represents an "entirely different rule". We disagree. In *Chateaugay*, Judge Lifland did not have to consider whether the indemnitor's claim for contribution was within the contemplation of the parties. It clearly was, and there is no indication that any argument was made to the contrary. Subsequently, when that issue was relevant to his analysis, Judge Lifland appropriately considered it. *See LTV Corp. v. Pension Benefit Guaranty Corp. (In re Chateaugay Corp.)*, 115 B.R. 760, 775 (Bankr.S.D.N.Y. 1990) (citing *In re Chateaugay Corp.*, 112 B.R. 513, 520 (S.D.N.Y.1990), and finding that PBGC's contingent claims arising out of pen-

sion plans terminated post-petition were not entitled to administrative priority), *withdrawn and vacated on consent*, 90 Civ. 6048 (KTD), 1993 WL 388809 (S.D.N.Y. June 16, 1993). Moreover, whether or not the test for determining when a contract claim arises has evolved in this circuit, Pearl's claim clearly arose during the Operating Period because Caldor's breach of the contract was clearly contemplated by the parties at the inception of their contractual relationship. *See Russell*, 193 B.R. at 571.

**20.** Pearl also misplaces its reliance on *In re Flood*, 234 B.R. 286 (Bkrtcy.W.D.N.Y.1999). That case did not address when a contract-based claim arises. Rather, the court was asked to consider whether a municipality had a "claim" for demolition costs it incurred which could be discharged in the property owner's bankruptcy case. *Id.* at 290–91. It found that it did not, even though many of the code violations that subsequently caused the structure to be declared unsafe and demolished existed at the time of the filing, because the city had not completed essential due process procedures required under municipal law, which meant that it did not have a right to recover the demolition costs from the owner or anyone sale. *Id.* at 292. The court did not hold that in order to have a "claim" based upon a contract, the non-debtor must have a presently enforceable "right to payment" occasioned by the debtor's breach or repudiation of the contract.

In light of our finding that a "claim" for damages arising from the breach of a contract arises at the time the parties enter into the contract, we need not address Pearl's alternative argument that its claim arose during the Wind–Down Period because Caldor "induced" Pearl to produce goods at that time. In that regard, we note that Pearl maintains in conclusory fashion that Caldor induced it to perform during the Wind–Down Period when it instructed its freight forwarders to resume accepting delivery of goods from foreign vendors after having erroneously directed them to stop doing so on or about January 18, 1999. Based upon this fact alone, Pearl argues that Caldor is estopped both as a matter of law and fact from arguing that it did not induce Pearl's continued performance after entry of the Wind–Down Order. However, Pearl has adduced no direct evidence in support of its argument that Pearl detrimentally and reasonably relied on representations or actions by Caldor amounting to "inducement" during the Wind–Down Period.[21]

Pearl also asserts that Caldor is obligated promptly to pay Pearl's administrative claim pursuant to 28 U.S.C. § 959(b) and our February 8, 1999 order authorizing Caldor to pay ordinary course expenses incurred during the Wind–Down Period. Section 959(b) provides as follows:

> Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b). Pearl does not allege that Caldor violated any state law by ter-

minating the purchase orders and failing to pay its claims. Nor would any such claim be cognizable. Caldor simply breached a contract. The Wind–Down Order and the February 8 Order directed Caldor to suspend paying Operating Period administrative claims and to pay ordinary course Wind–Down Period administrative expenses as and when incurred. As such, Pearl's argument lacks merit.

### Conclusion

We grant the motion to the extent Pearl seeks a determination that its claim is entitled to administrative priority status under the Bankruptcy Code. We deny Pearl's request that we direct Caldor to pay that claim in full, and direct that it be paid on a pro rata basis with other allowed Operating Period claims.

SETTLE ORDER.

---

**21.** Mr. Chin of Swire was the only person deposed in connection with Pearl's motion. The affidavit testimony submitted by Pearl does not speak to what actions Pearl took based upon what it was told by Pearl or learned elsewhere about Caldor.