In re COMMODORE BUSINESS MACHINES, et al., Debtors.

Franklyn R. Wilson and MacGregor N. Robertson, as Liquidators, and Fulbright & Jaworski, L.L.P and William J. Rochelle, III, Appellants–Petitioners,

v.

Creditors' Committees of Commodore International Ltd., Commodore Electronics Ltd., and Commodore Business Machines, Inc. Appellees–Respondents.

No. 95 Civ. 8477(DAB).

United States District Court, S.D. New York.

March 15, 2000.

Fulbright & Jaworski, L.L.P., New York City, Evelyn H. Biery, William J. Rochelle, III, Letitia J. Hanson, of counsel, for the Appellants.

Orrick, Herrington & Sutcliffe, L.L.P., New York City, Michael E. Emrich, Lorraine S. McGowen, of counsel, for Creditors' Committees of Commodore International, Ltd. and Commodore Electronics, Ltd.

Stroock & Stroock & Lavan, L.L.P., Boston, MA, Stephen M. Richmond, Peter J. Antoszyk, Lisa G. Beckerman, of counsel, for Creditors' Committee of Commodore Business Machines, Inc.

## MEMORANDUM & ORDER

BATTS, District Judge.

Franklyn R. Wilson and Macgregor N. Robertson (the "Liquidators"), together with Fulbright & Jaworski, L.L.P. ("Fulbright") and William J. Rochelle, III ("Rochelle") (collectively, "Appellants"), appeal from two Orders entered in the United States Bankruptcy Court, Southern District of New York (James L. Garrity, Jr., U.S.B.J.). Appellants also petition for a writ of mandamus. For the following reasons, the decision of the Bankruptcy Court on August 7, 1995 is AFFIRMED, the appeal of the September 21, 1995 Order of the Bankruptcy Court is dismissed for lack of jurisdiction, and the petition for a writ of mandamus is DENIED.

## I. BACKGROUND

### A. The Parties

Commodore International Limited ("CIL") and Commodore Electronics Limited ("CEL") are incorporated in the Commonwealth of the Bahamas under the International Business Companies Act. (Appellants' Brief[1] at 1, 3.) CIL and CEL were "the ultimate corporate parents" of approximately 40 international corporations involved in the development, manufacture, and distribution of computers. (*Id.*) Approximately 6% of the total sales were generated in the United States; principal markets were in Europe and manufacturing was performed in Asia. (*Id.*) By 1995, CIL, CEL, and their affiliated corporations were engaged in liquidation proceedings on a global scale. (Appellees' App. Tab 8, at 31–32.)

Commodore Business Machines, Inc., ("CBM"), one of the "indirect subsidiaries" of CIL and CEL, is incorporated in the United States and has its principal place of business in the United States. (Appellants' Brief at 5; CBM Brief at 6.)

### B. Commencement of Liquidation Proceedings in the Bahamas and the Southern District of New York

On April 29, 1994, CEL commenced liquidation proceedings in the Bahamas. (Appellants' Brief at 3–4.) On or about the same day, the Supreme Court of the Bahamas (the "Bahamian Court") appointed Messrs. Wilson and Robertson as the Liquidators of CEL. (Appellants' Brief at 4; CBM Brief at 6.) On May 4, 1994, three creditors of CBM, CIL, and CEL commenced involuntary petitions in the United States Bankruptcy Court, Southern District of New York (the "Bankruptcy Court").[2] (Appellants' Brief at 4; CBM Brief at 6.) On May 24, 1994, an involuntary petition was filed in the Bahamas for the liquidation of CIL (in addition to liquidation already pending for CEL). (*Id.* at 4.) Messrs. Wilson and Robertson also were named trustees for the benefit of creditors under Bahamian law. (CBM Brief at 6.)

On May 25, 1994, the Liquidators filed a petition in the Bankruptcy Court for commencement of an ancillary proceeding under 11 U.S.C. § 304 and a motion seeking to have the Bankruptcy Court abstain from exercising its jurisdiction with respect to the United States proceedings against CIL and CEL. (Appellants' App. at 46–47.) During the pendency of these proceedings, the Liquidators and the Unofficial Committee negotiated and entered into a "Protocol", which purported to set forth the conduct of the liquidation proceedings in the Bahamas and the United States. (Appellants' App. at 6–19.) The Liquidators and the Chairman of the Unofficial Committee signed the Protocol on December 8, 1994, and the Protocol was authorized, ratified and approved by Judge Garrity on January 20, 1995. (*Id.* at 4.) Under the terms of the Protocol, the Unofficial Committee became the "Official Committee of Unsecured Creditors" of CIL

---

**1.** The parties have also submitted voluminous Appendices constituting the pleadings and other records from the proceedings in both the Bahamian Supreme Court and the Bankruptcy Court of the Southern District of New York. References to the Appellants' Appendix shall reference only the Bates-stamped page numbers in the appendix, preceded by "Appellants' App.". Appellees' Appendix, which is tabbed rather than Bates-stamped, shall reference the tab number and the page number. Although the Appellees submitted a joint Appendix, the Appellees have submitted separate briefs. The brief submitted by the Official Creditors' Committee of CEL and CIL shall be referenced as the "CEL/CIL Brief", and the brief submitted by the Official Creditors' Committee of CBM shall be referenced as "CBM Brief."

**2.** Although the creditors are not named in the briefs, the creditors appear to include Prudential Insurance, "Anchor", and another unnamed entity. (Appellants' App. at 105.) Creditors who commenced proceedings in the United States became known as the "Unofficial Committee of Unsecured Creditors" (the "Unofficial Committee"). (Appellants' App. at 19.)

and CEL (the "CIL/CEL Committee"). (*Id.* at 3.) Pursuant to the Protocol, Fulbright and Jaworski, L.L.P. was retained as attorneys for the Liquidators in the United States. (Appellants' App. at 12.) CBM was not a party to the Protocol. (CBM Brief at 7.)

## C. The Sale

On or around April 21, 1995, the Bankruptcy Court approved the sale of substantially all of the assets of CEL, CIL, and CBM to Escom AG (the "Sale Order"). (Appellants' App. at 20–28, 49.) The Liquidators also obtained approval of the sale from the Bahamian Court. (Appellants' App. at 49.) Over the objection of the creditors of CBM ("CBM Committee") and the United States Trustee, the sale proceeds of $10,000,000 were deposited by the Liquidators in an interest-bearing account (the "Account") at the Royal Bank of Canada, located in the Bahamas. (Appellants' App. at 50.) In "so ordering" the deposit of the proceeds, Judge Garrity relied on representations of the Liquidators' American counsel, William J. Rochelle, III, of Fulbright and Jaworski, that the Liquidators were subject to the jurisdiction of the Bankruptcy Court of the Southern District of New York. (*Id.*) No funds in the Account could be disbursed "except upon further order of a court of competent jurisdiction." (*Id.* at 27–28, 51.) A status conference was set for June 7, 1995, to resolve issues related to disbursement and allocation of the sale proceeds. (CBM Brief at 11.)

At the status conference on June 7, 1995, the parties informed Judge Garrity that proceedings before the Bahamian Court continued during the pendency of the proceedings in the United States. (Appellees' App. Tab 8, at 26–32.) Because the proceeds from the sale to Escom constituted substantially all of the assets available to pay creditors of all of the various interrelated debtor corporations (CIL, CEL, CBM, and other companies located throughout the world), (Appellees' App. Tab 8, at 9–11), the parties discussed strategies for a global resolution. (*Id.* at 11.)

In light of the complicated nature of the competing claims, Judge Garrity also conducted status conferences on July 5, 1995, July 12, 1995, and July 20, 1995, all to discuss allocation of the sale proceeds. (CIL/CEL Brief at 9.)

## D. Parallel Proceedings in the Bahamas: The Originating Summons and the Account Order

On July 11, 1995, at the request of the Liquidators, the Bahamian Court issued an *ex parte* Originating Summons (the "Summons") against CBM, Commodore Italiana S.p.A., and Commodore Buromaschinen GmbH. (CBM Brief at 13.) The Summons sought a declaration that the subsidiaries of CIL (including CBM) be considered a "single economic unit" with CIL; a declaration that the Liquidators and the Supreme Court of the Bahamas are entitled to retain control over the Account; and an injunction restraining removal of the funds from the Account in the Bahamas until a judgment or further order of the Bahamian Court. (CBM Brief at 13.)

In support of the Summons, Rochelle filed an Affidavit in the Bahamian Court asserting, *inter alia,* that "[t]o the best of my knowledge, information and belief, no proceedings are now pending in the Bankruptcy Court, or in any other court in the United States with respect to a disposition of the Escrowed Funds [the Account]." (Appellees' App. Tab 24, at 4.) Rochelle's Affidavit was dated July 14, 1995. (*Id.*) Rochelle appeared at status conferences and hearings before Judge Garrity of the United States Bankruptcy Court on April 21, June 7, July 5, July 12, and July 20, 1995. (Appellees' App. Tabs 6, 8, 13, 15, 17.)

Upon receipt of the Summons, CBM informed Fulbright that it considered the Summons a violation of the automatic stay and of the jurisdiction of the Bankruptcy

Court over CBM, and that the Summons "appeared inconsistent" with Rochelle's representations before the Bankruptcy Court.[3] (CBM Brief at 14.) The letter also sought information regarding Fulbright's involvement with the Summons and sought withdrawal of the Summons as to CBM. (*Id.* at 14–15.)

By letter dated July 28, 1995, Rochelle refused to divulge information regarding Fulbright's involvement with the issuance of the Summons, asserting attorney-client privilege. (CBM Brief at 15.) Rochelle also contested the Bankruptcy Court's jurisdiction and asserted that the Liquidators could proceed against the Account only upon further order of the Bahamian Court, not the Bankruptcy Court. (*Id.*)

On the same day, the Liquidators sought and obtained, in the Bahamas, an *ex parte* order (the "Account Order") enjoining CBM from taking any action to cause removal of the funds in the Account from the jurisdiction of the Bahamian Court. (CBM Brief at 15; CIL/CEL Brief at 12.)

### E. CBM's First Application for Contempt

On August 2, 1995, the CBM Committee filed an emergency application with the Bankruptcy Court seeking, *inter alia*, a restraining order enjoining the Appellants from taking further action with respect to the Account, a declaration holding the Appellants in contempt, and imposition of sanctions. (CIL/CEL Brief at 13.) At the hearing on August 2, 1995, Judge Garrity stated:

> I am really quite troubled by what I view as the unilateral acts taken by the Liquidators in the Bahamas, which although arguably may be within the letter of our Order that was entered with respect to the proceeds of the Sale, *it certainly was not within the spirit of what we discussed*, and I'm particularly troubled by the fact that you had representatives of the Liquidators in the Courtroom attending hearings, listening to the colloquy, at times participating in the colloquy among the parties and representatives of the parties, *yet they remained silent with respect to what was happening in the Bahamas.*
>
> Unfortunately, what appears to me to be a complete lack of candor with the Court has brought us, it seems, in a collision course with the Bahamian Court.
>
> We find that to be particularly troubling given the fact that the Bahamian Court has shown tremendous willingness to cooperate in these cases.
>
> They obviously embraced the Protocol and that Court is on record with its commitment to work toward harmonizing the proceedings, as this Court is as well.
>
> As I've indicated before during our discussion, *I'm not troubled . . . by what the Bahamian Court did.* I assume the Bahamian Court in issuing the [Account] Order which gives rise to this motion, was acting within its authority.
>
> . . .
>
> What this problem is in my view is the fact that notwithstanding the understanding that was reached by the parties, we had the Liquidators go off and in my view, as I have already indicated, in violation of the spirit, I should say contrary to the spirit of what we had been attempting to achieve with respect to the disposition of the sale proceeds, take *actions in the Bahamas which have basically upset the status quo.*

(Appellees' App. Tab 20, at 83–84, emphases added.) Judge Garrity then ordered the Liquidators to withdraw the Summons, take "whatever steps are necessary to ensure that the [Account] Order be vacated, and report in writing whether any funds had been disbursed from the Account." (*Id.* at 85.) Judge Garrity also temporari-

---

**3.** Appellants contend that the Creditors' Committees "went ballistic" over the Summons. (Appellants' Brief at 8.)

ly restrained the Liquidators from taking any further actions with respect to the funds in the Account, noting,

> I don't think it's in anybody's interest to get bogged down on litigation regarding allegations of violations of the stay and contempt and anything else. I think what we should be doing here is moving toward trying to get to some consensual arrangement to get a distribution of the funds and to achieve that.

(*Id.*) Judge Garrity specifically emphasized a global resolution of the liquidation proceedings, and, in furtherance of that objective, directed a copy of the transcript of the proceedings be provided to the Bahamian Court. (*Id.* at 95–93.) The Bankruptcy Court also denied, without prejudice, CBM's motion for contempt and sanctions, and set another hearing for August 11, 1995. (*Id.* at 86–87.)

### F. The Liquidators' Continuing Actions in the Bahamas

On August 8, 1995, the Liquidators filed another *ex parte* motion in the Bahamas, with a return date of August 10, 1995, seeking an order that the Liquidators were subject to the jurisdiction of the Bahamian Court only, and that the Liquidators "are not required to obey the purported Orders or directions of any other Court or authority wherever emanating ... except by lawful application to this Court." (Appellees' App. Tab 27, at 2.) As of November 13, 1997, the date that the bankruptcy appeals were fully submitted, the Bahamian Court had not granted relief on the August 8, 1995 motion, and the parties have not informed the Court of any action by the Bahamian Court from that date forward.

### G. The August 11, 1995 Hearing before the Bankruptcy Court

In light of the Liquidators' actions after the August 2, 1995 hearing, the CBM Committee sought, *inter alia,* transfer of the funds in the Account to the United States, further injunctive relief against the Liquidators, and sanctions against the Liquidators for failing to comply with the Bankruptcy Court's Order of August 2, 1995, entered August 7, 1995 (the "August 7, 1995 Order"). (Appellees' App. Tab 29.) At the hearing, the Bankruptcy Court found that the Liquidators and their counsel, Rochelle and Fulbright, had not complied with the orders of the Bankruptcy Court from the August 2 hearing, with the exception of filing copies of affidavits filed by Wilson (one of the Liquidators) and Rochelle.[4]

The Bankruptcy Court then denied, without prejudice, the transfer of the funds to the United States, stating that transfer of the funds from the Bahamas would be "inappropriate" until the Bahamian Court had an opportunity to consider all of the matters related to the Protocol and jurisdiction over the Account. (Appellees' App. Tab 30 at 168–69.) Finally, the Bankruptcy Court found that the Liquidators and their counsel, by their *ex parte* actions in the Bahamas, had violated the automatic stay, violated the August 7 Order, "unnecessarily compounded the litigation of this case," and "undermined the spirit of the Protocol, as well as ... [the April 21, 1995 Sale Order]." (Appellees' App. Tab 30 at

---

4. Specifically, the Bankruptcy Court ordered:
 1) that the Liquidators take all action to have the July 11, 1995 Summons "dismissed and withdrawn in its entirety";
 2) that the Liquidators take all action to have the July 28, 1995 Account Order "dismissed and withdrawn in its entirety";
 3) that the Liquidators take all action to withdraw or dismiss any motions which gave rise to the Account Order;
 4) that the Liquidators file and serve all parties, on or before August 4, 1995, with a written report indicating the amount of funds, if any, withdrawn from the Account since its establishment;
 5) that the Liquidators file a complete copy of the transcript of the August 2 hearing with the Bahamas Supreme Court; and
 6) Fulbright, as U.S. counsel for the Liquidators, file copies of Rochelle's Affidavit and any other affidavits and accompanying pleadings filed in the Bahamas Supreme Court.
 (Appellees' App. Tab 30 at 166–67.)

172–76.) Thus, the Bankruptcy Court concluded, pursuant to 28 U.S.C. § 1927, 11 U.S.C. § 105, and the Bankruptcy Court's inherent power, counsel for the Liquidators should be sanctioned. (*Id.* at 175; Appellees' App. Tab 34 at 42.) On September 21, 1995, the Bankruptcy Court issued its Findings of Fact and Conclusions of Law (the "September 21. 1995 Order"). (Appellees' App. Tab 34.) Although the Bankruptcy Court concluded that sanctions would be appropriate, the Bankruptcy Court ordered appellants to show cause why they should not be sanctioned.[5] (*Id.* at 43.)

### H. The Appeals

The first appeal (95 Civ. 8477) was filed on October 5, 1995; it concerned the August 7, 1995 Order. The second appeal (95 Civ. 9973) was filed on November 27, 1995, appealing the September 21, 1995 Order. The two appeals were then consolidated.

The parties stipulated to several extensions of the briefing schedule, indicating to this Court that they were discussing settlement. In January 1997, the parties indicated that a motion for reconsideration (the "Reconsideration Motion") had been filed in the Bankruptcy Court; if the Bankruptcy Court granted reconsideration, the pending appeals before this Court would be mooted. The parties were then directed to keep the Court informed of the proceedings in the Bankruptcy Court by submitting status letters every ninety (90) days. Specifically, the Liquidators "gave the Bankruptcy Court an opportunity [sic] to reconsider its injunction in light of" *In re Maxwell Communication Corp.*, 93 F.3d 1036 (2d Cir.1996). (Appellants' Mem. at 2.) The parties filed over 200 pages of pleadings. (*See* Appellants' App. at 86–300.) On May 16, 1997, and July 1, 1997, the Bankruptcy Court held hearings regarding its prior Orders and the pending Motion for Reconsideration.

At the May 16, 1997 hearing, the parties appeared to have agreed to request, jointly, that Judge Garrity vacate the Orders of August 7, 1995 and September 21, 1995 enjoining the Liquidators from further filings in the Bahamian proceedings. (*See, e.g.*, Appellants' App. at 1247–50, 1260–64.) However, the parties also indicated that they would not consent to a joint request that the injunction be vacated, unless a separate agreement was also reached regarding the Bankruptcy Court's review of Fulbright's fees. (Appellants' App. at 1254–57, 1261–64, 1265–66, 1278–79.) Judge Garrity discouraged the parties from linking Fulbright's fees with withdrawal of the injunction; the parties then suggested additional time to agree upon and prepare an Order for Judge Garrity to sign that would vacate the injunctions. (*Id.* at 1284–93.)

When the parties appeared before the Bankruptcy Court again on July 1, 1997, they still had not agreed to a joint request to vacate the injunctions. (Appellants' App. at 1298–1304.) The transcript ended when Judge Garrity called a recess and continued discussions with the principal attorneys in his chambers. (*Id.* at 1304.)

On September 8, 1997, at a status conference scheduled to address interim fee applications made by the Appellees, Fulbright (on behalf of the Liquidators) renewed its request that the Bankruptcy Court hear the Reconsideration Motion, notwithstanding the Liquidators' appeal of those very Orders to this Court and the hearings in 1997 in which the parties appeared to make a joint request to have those Orders vacated:

THE COURT: So, in your view, what we should be doing today is going forward with the reargument motion, notwithstanding the fact that you've perfected the appeal. That we should deal with all of that and let them commence an adversary proceeding.

---

5. Appellants were directed to show cause, before the Bankruptcy Court on November 3, 1995, why they should not be sanctioned; however, in light of the appeals to this Court, the parties did not appear before the Bankruptcy Court on November 3, 1995.

See, I had the distinct impression that what we had agreed to, that in order to diffuse [defuse] the situation, in order to find out whether this plan, which may or may not have been agreed to among the parties, can possibly fly in the Bahamas, and I understand there are problems there, but I thought—I left that meeting with the distinct impression that we had agreed that in order to deal with these sensitive issues that are on appeal and on reconsideration, in order to diffuse everything, we get right down to the issue, and the issue—the only issue was that fee.

And obviously that's not what you folks agreed to.

MR. ROCHELLE: Your Honor, I think a basic misunderstanding has been that the only difficulty in the United States is not the fee. Our adversaries have continued to say that that is the only problem in the United States, the fee. But it is, in point of fact, not the only problem in the United States.

THE COURT: What relevance does it have on what we had talked about in that conference? I mean, I wouldn't have wasted your time, I wouldn't have wasted anybody's time. I thought we had an agreement. And I asked ... is there any need to go out and put this on the record? Should we do that? Now we can get this thing behind us? "No, Judge, we don't have to," is what everyone agreed to.

(CIL/CEL Mandamus Brief, Ex. A, at 29–30.)

Although it is not completely clear from the transcript, Fulbright appeared to assert that prior meetings had only been held to discuss scheduling matters, and that the Bankruptcy Court could not consider the various interim fee applications for "lack of a case or controversy."[6] (*Id.* at 31.) After much argument concerning Rochelle's statements in open court at oth-

er conferences, the Bankruptcy Court again discussed possible motion practice relating to Fulbright's fees. (CIL/CEL Mandamus Brief, Ex. A, at 63–94.) Ultimately, the Bankruptcy Court did not rule but directed the parties to appear on September 16, 1997, for another hearing concerning possible motion practice regarding Fulbright's fees. (*Id.* at 109.)

At the September 16, 1997 hearing, the Bankruptcy Court summarized the parties' various positions:

THE COURT: ... In this transnational insolvency case there are, among other things, two matters that are pending in the U.S. Courts.

One is an application brought on by the Liquidators asking us to reconsider the September 21st Order that we had issued. The second is an appeal of that order to the District in—which is pending now in the District Court.

Now, as we understand it, and I think the record is clear from the hearing, our last hearing and others that have been before the Court, we have, both Creditors Committees are willing to resolve the sanction issues that are a part of the September [21] '95 Order, and the Committees are prepared to resolve this unconditionally by withdrawing their request for sanctions and asking us to vacate our September [21, 1995] Order.

They are prepared to deal with Fulbright & Jaworski as Liquidators' counsel to the extent that it was sanctioned in that [September 21, 1995] Order in the same fashion, except what they seek to do is to reserve their rights to raise issues with respect to the conduct of Fulbright in the context of a review of the Fulbright & Jaworski fees.

(CIL/CEL Mandamus Brief, Ex. B, at 3–4.) As it appeared that a request to vacate the August 7, 1995 and September 21, 1995 Orders would be forthcoming, the Bank-

---

6. Fulbright appeared to be making some form of jurisdictional or constitutional argument (not before this Court on appeal), although it is not clear from the record exactly what that argument was. (*See, e.g.,* CIL/CEL Mandamus Brief, Ex. A, at 30–35.)

ruptcy Court did not rule on the Reconsideration Motion.

Sixteen days later, on October 2, 1997, Fulbright and the Liquidators filed the third action (97 Civ. 7352), styled as a petition for a writ of mandamus. Structured as alternative relief in the event the Court denied their appeals, Fulbright and the Liquidators sought a writ of mandamus directing the Bankruptcy Court to hear the Reconsideration Motion. (Petition for Mandamus ¶¶ 13–14.) In response, the Appellees filed a Motion to Dismiss and a Motion to Strike.

## II. DISCUSSION

### A. Petition for Mandamus (97 Civ. 7352)

If the Court issues a writ of mandamus directing the Bankruptcy Court to hear the Motion to Reconsider the Bankruptcy Court's Orders of August 7, 1995 and September 21, 1995, the previously-filed appeals will be moot. Therefore, the Court turns to the Petition for Mandamus first, before reaching the merits of the earlier-filed appeals.

#### 1. Standard for Issuance of a Writ of Mandamus

■ "[M]andamus cannot be used as a substitute for an appeal." *In re United States*, 680 F.2d 9, 12 (2d Cir.1982) (collecting cases). "The remedy of mandamus is a drastic one and is to be invoked only in extraordinary situations." *In re Petition of Singer*, 1997 WL 685343 at *2 (S.D.N.Y. 1997). Mandamus "has traditionally been used in the federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *In re United States*, 680 F.2d at 12 (internal citations omitted). "Mere er-

ror, even gross error in a particular case, as distinguished from a calculated and repeated disregard of governing rules, does not suffice to support issuance of the writ." *Id.*

#### 2. The Reconsideration Motion

■ The Liquidators filed the Reconsideration Motion on March 20, 1997, nearly two years after the first notice of appeal (95 Civ. 8477) was filed in the District Court. The Reconsideration Motion was filed in the Bankruptcy Court in order to "[give] the Bankruptcy Court an opportunity [sic] to reconsider its injunction in light of" *Maxwell*, a Second Circuit opinion that was decided on August 21, 1996.[7] (Appellants' Mem. at 2.) Specifically, the Liquidators assert that they seek the extraordinary remedy of mandamus "because the preliminary injunction, two years old, has been effectively converted to a permanent injunction," and because "the Bankruptcy Court has declined to hear a dispositive rehearing motion." (Appellants' Mandamus Mem. at 35.)

Appellants are incorrect. The Bankruptcy Court did hold a hearing on May 16, 1997. Indeed, the Bankruptcy Court allowed counsel for the Appellants to present opening arguments regarding the Reconsideration Motion. (Appellants' App. at 01228–01244.) At the hearing, it appeared that the parties had reached some form of agreement regarding a joint request to vacate the Orders that Appellants sought to have the Bankruptcy Court reconsider:

> MS. BIERY: In this case, Your Honor, the Temporary Restraining Order and the Preliminary Injunction are a loaded pistol to the heads of the lawyers for the Liquidators.

seeking essentially the same relief that had previously been denied by the British Court. In affirming dismissal of the adversary action, the District Court and the Second Circuit relied on the doctrine of international comity. *Id.* at 1054, 1055.

---

**7.** *Maxwell* concerned a "unique case involving cooperative parallel bankruptcy proceedings seeking to harmonize two nations' insolvency laws for the common benefit of creditors." 93 F.3d at 1054–55. In *Maxwell*, the debtor filed an adversary proceeding in the United States Bankruptcy Court,

THE COURT: Why is it now almost two years after these things were entered that it has become a loaded gun?

MS. BIERY: It always has been. This is what happened in this case—

THE COURT: Wait a minute. Is it not the case, then, that if this problem went way there wouldn't be an agreement on a Plan?

MS. BIERY: Your Honor, we still have to deal with the international creditors.

THE COURT: No, no, I understand that, Ms. Biery. I understand that. They are not here. The people who are here are the ones who are complaining about the activities twenty months ago. *I am being told there is agreement now among those parties. They want to go forward together and have Plans confirmed together.* They want to do all of that, but there is one problem. They think that the Liquidators' counsel's actions in this case have been wrong, and the Liquidators presumably don't agree with them. That's the only issue.

(Appellants' App. at 1236–37, emphasis added.) After further discussion, it appeared that the only issue remaining was the question of Fulbright's attorney's fees:

THE COURT: ... We have, I think, a more discrete problem. We have, it appears to me, at least as I understand this, what we have is the one item that is jammed up, the bottleneck here [Fulbright's fees], and if we can get that out of the way, we can move the Plan process forward.

I am not saying that, yes, their motion, the Committees' motion should be granted. I am not saying it should be denied either. I am saying, let those chips fall where they may.

I understand the Fulbright view on this and the Liquidators' view on this and that you don't believe there ought to be a modification for the protocol and I will rule on that. *But the point is that this Order that has caused all the problems can be dealt with in such a way*

*because of the agreement of the parties, can be dealt with in such a way that there is no cocked gun to anyone's head.*

The whole issue will be, what portion, if any, of the fees that are awarded in the Bahamas should be disgorged for whatever reason, consistent with whatever is in the protocol or whatever comes from the motion satisfying the protocol?

MS. BIERY: Would that mean, then, Your Honor, that the Court's ruling on the motion is to require us to file a full fee application in the United States would be denied [sic] and the protocol would be affirmed as written?

THE COURT: No, I am not saying that at all. I am saying that what I will expect is that you folks, in an effort to resolve the one piece that is open here, would say, "All right, let them make their motion [for fees]. They make it. We would oppose it. Whatever the Court ends up doing, the Court will do. And if it's going to be a more in depth review, it will be a more in depth review. If not, it will be where it falls."

*The point is, the concern with respect to the conduct of the Liquidators and their counsel back twenty months ago during that couple of week period [sic] will not be on the table.*

MS. BIERY: That's what we are trying—

THE COURT: *Because the Orders [appealed from] would have been vacated on the request of all the interested parties ...*

(Appellants' App. at 1252–54, emphasis added.) Ultimately, the CBM Committee and the CIL/CEL Committee offered to release Fulbright and the Liquidators from any liability arising from the September 21, 1995 Order, pending a review of Fulbright's fees. (Appellants' App. at 1268–74.)

By July 1, 1997, the parties still could not agree to a procedure by which to vacate the September 21, 1995 Order, not-

withstanding the consent by the CBM Committee and the CIL/CEL Committee. Apparently, the Reconsideration Motion was not moot, and the Bankruptcy Court conducted another conference during which it was agreed that a motion regarding Fulbright's fees would be heard concurrently with the Reconsideration Motion.[8] (CIL/CEL Comm. Mandamus Brief at 13.)

Finally, on September 16, 1997, nearly two years after the Orders were first entered, the Bankruptcy Court reluctantly concluded that a joint request to vacate those Orders would not be forthcoming. However, at no time during the two years during which the Orders were pending did Fulbright or the Liquidators ask for a hearing on the Preliminary Injunctions, nor did they do anything other than represent to the Bankruptcy Court (and, indeed, to this Court) that they would be able to resolve the dispute via settlement.

The Petitioners sat on their rights for two years without seeking a hearing on the injunctions. They filed the Reconsideration Motion seven months after the Second Circuit decided *Maxwell.*[9] For six months after filing the Reconsideration Motion, the Petitioners represented to the Bankruptcy Court that they could arrive at a joint request with the Committees to vacate the Orders, which would render the Reconsideration Motion and the two appeals moot. During those six months, the Bankruptcy Court held five hearings or conferences related to the Reconsideration Motion, where the Bankruptcy Court made

clear that it would not rule on the Reconsideration Motion so long as the parties indicated they were close to a joint request to have the Orders vacated. During this entire two-year period, the parties requested that this Court refrain from deciding the appeals since they were pursuing settlement. Furthermore, the Bankruptcy Court questioned the propriety of deciding the Reconsideration Motion given that the appeals of those Orders were already pending before this Court. Finally, rather than simply notifying this Court that settlement could not be effected (and thus, this Court should decide the pending appeals), Fulbright and the Liquidators filed a separate mandamus action only sixteen days after the last hearing in the Bankruptcy Court.

Petitioners have engaged in duplicative and duplicitous motion practice. In their brief in support of mandamus, Petitioners do not even address whether mandamus is an appropriate remedy at this juncture and on these facts. Based on this Court's independent review, there is nothing whatsoever in the record to suggest that the Bankruptcy Court shirked its duty in any way. To the contrary, the Bankruptcy Court repeatedly attempted to facilitate an amicable resolution of the Reconsideration Motion and the appeals. Accordingly, the petition for a writ of mandamus is DENIED.

### B. The Appeals

Having found that a writ of mandamus is unwarranted, the Court now

---

8. Appellants/Petitioners' briefs make no mention whatsoever of any proceedings after the filing of the appeals in 1995, with the exception of the transcripts of the May 16, 1997 and the July 1, 1997 hearings. Appellants/Petitioners argue only that the Bankruptcy Court overlooked *Maxwell* and "has so far declined to hear the rehearing motion or to hold a hearing on a permanent injunction." (Appellants' Mandamus Brief at 10.) Such an argument is disingenuous at best, as the parties had represented to the Bankruptcy Court that they would be making a joint request to vacate the Orders, and thus, the Reconsideration Motion and pending appeals would be moot.

9. Nor would *Maxwell* have helped Appellants had the Bankruptcy Court agreed to reconsider the August 7, 1995 and September 21, 1995 Orders in light of *Maxwell.* The substantive questions addressed in *Maxwell* are different. Indeed, *Maxwell* compels the same result here, where Appellants sought a second bite at the apple, *ex parte*, in the Bahamian Court without fully informing either the Bahamian Court or the United States Bankruptcy Court of the status of the parallel proceedings.

turns to the merits of the appeals, specifically, the August 7, 1995 Order and the September 21, 1995 Order. Orders issued by a bankruptcy court are subject to appellate review pursuant to Federal Rule of Bankruptcy Procedure 8013. The district court reviews the bankruptcy court's findings of fact under a clearly erroneous standard, and any conclusions of law de novo. *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir.1994); *PaineWebber, Inc. v. Gollomp (In re Gollomp)*, 198 B.R. 433, 436 (S.D.N.Y.1996). "Deference is given to the original fact finder because of that court's expertise and superior position to make determinations of credibility." *In re Gollomp*, 198 B.R. at 436; Fed. R. Bankr.P. 8013. Under the clearly erroneous standard, a lower court's choice between two permissible views of the facts cannot be held to be clearly erroneous. *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985); *In re Grant Assocs.*, 154 B.R. 836, 840 (S.D.N.Y.1993). "To be clearly erroneous, a decision must strike [the court] as more than just maybe or probably wrong; it must ... strike [the court] as wrong with the force of a five-week-old unrefrigerated dead fish." *Parts and Elec. Motors, Inc. v. Sterling Elec., Inc.*, 866 F.2d 228, 233 (7th Cir.1988), *cert. denied*, 493 U.S. 847, 110 S.Ct. 141, 107 L.Ed.2d 100 (1989).

1. The August 7, 1995 Order

■ "The decision whether to grant or deny interim injunctive relief ... rests in the sound discretion of the district court, and will not be disturbed on appeal absent a showing of abuse of discretion." *Woodlawn Cemetery v. Local 365, Cemetery Workers and Greens Attendants Union*, 930 F.2d 154, 156 (2d Cir.1991). "In order to justify the award of a preliminary injunction, the moving party must first demonstrate that it is likely to suffer irreparable harm in the absence of the requested relief." *Bery v. City of New York*, 97 F.3d 689, 693 (2d Cir.1996), *cert. denied*, 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174

(1997). Once the likelihood of irreparable harm has been demonstrated, a movant ordinarily is entitled to relief if it demonstrates "either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir.1996) (internal citations omitted).

■ It is undisputed that in seeking the Summons, the Liquidators (through Rochelle) represented to the Bahamian Court that no proceedings were pending in the Bankruptcy Court or in any other United States Court, when proceedings were in fact pending in the Bankruptcy Court. It is also undisputed that Rochelle attended at least four conferences and hearings before the Bankruptcy Court just prior to making his representation before the Bahamian Court. Rochelle had also represented to the Bankruptcy Court that he and the Liquidators "certainly" were subject to the jurisdiction of the Bankruptcy Court.

The Bankruptcy Court found that the Appellants had "upset the status quo" in causing the Summons and Account Order to be issued in the Bahamian Court. (Appellees' App. Tab 20, at 83–84.) Judge Garrity ordered the Liquidators to withdraw the Summons, have the Account Order vacated, and enjoined the Liquidators from taking any further actions with regard to the Account, pending a report indicating whether any funds had been disbursed from the Account. Citing "a complete lack of candor with the Court" by the Appellants, Judge Garrity emphasized that the injunctive relief was granted in order to ensure that the Bahamian Court and the United States Bankruptcy Court were provided full information relevant to the proceedings pending in both the United States and the Bahamas. (*Id.*)

This Court cannot conclude that the Bankruptcy Court abused its discretion in

ordering that the Account be preserved until the Bahamian Supreme Court was provided with a full disclosure of the Liquidators' actions in the United States. Thus the August 7, 1995 Order is hereby AFFIRMED. The Bankruptcy Court's August 7, 1995 Order remains in full force and effect.

### 2. The September 21, 1995 Order

Instead of complying with the August 7, 1995 Order, or contesting it in the Bankruptcy Court, the Appellants poured gasoline on the fire by seeking an order from the Bahamian Court that the Liquidators were subject to the jurisdiction of the Bahamian Court only. Upon learning of the Appellants' actions, the CBM Committee renewed its motion for sanctions and contempt. In issuing its Findings of Fact and Conclusions of Law, the Bankruptcy Court directed the Liquidators to "refrain from exercising control over the Account, or taking any steps to exercise such control, or otherwise taking any action with respect to the Account, except as is necessary to litigate the matters presently pending before the Bahamian Court, absent further order of this Court." (Appellees' App. Tab 34, at 42.) Notably, the Bankruptcy Court denied, without prejudice, many of the requests of the Appellees until after the Bahamian Court had "ruled on the matters before it arising out of the . . . Summons." (*Id.* at 42–43.)

■ In bankruptcy appeals, the district court has jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). An appealable bankruptcy order must resolve "at least an entire claim on which relief may be granted." *In re Fugazy Express, Inc.,* 982 F.2d 769, 775–76 (2d Cir.1992). It is axiomatic that a finding of civil contempt is not final for purposes of appeal until a sanction is imposed and a final judgment is entered. *See Cunningham v. Hamilton*

*Cty.,* 527 U.S. 198, 119 S.Ct. 1915, 1922, 144 L.Ed.2d 184 (1999) (sanctions order imposed on attorney is not a final decision for purposes of appeal under 28 U.S.C. § 1291); *Pro–Choice Network of Western New York v. Walker,* 994 F.2d 989, 994 (2nd Cir.1993) (civil contempt actions not immediately appealable); *United States v. Johnson,* 801 F.2d 597, 599 (2d Cir.1986) (citing *Cobbledick v. United States,* 309 U.S. 323, 325, 60 S.Ct. 540, 84 L.Ed. 783 (1940)).

■ The September 21, 1995 Order did not resolve any claims upon which relief could be granted, but only sought to maintain the status quo until the Bahamian Court had resolved the issues pending before it. The Bankruptcy Court found that the Liquidators were in contempt of the August 7, 1995 Order because they clearly did not comply with it, and because they collaterally challenged that Order in the Bahamian Court rather than challenging or appealing it in the Bankruptcy Court or the District Court in the United States. (Appellees' App. Tab 34, at 4–35.) However, instead of ordering sanctions, the Bankruptcy Court provided Appellants with notice and an opportunity to be heard, by ordering the Appellants to show cause why they should not be sanctioned, pursuant to the Bankruptcy Court's inherent powers, 11 U.S.C. § 105(a), and 18 U.S.C. § 1927.[10] (Appellees' App. Tab 34, at 42.) Thus, the September 21, 1995 Order is not a final order, appealable as of right, as there has been neither a final judgment in the action, nor an order of sanctions.

■ It is possible that the Appellants challenge the Bankruptcy Court's finding that Appellants violated the August 7, 1995 Order and "unreasonably and unnecessarily multiplied proceedings herein and increased the costs of litigation to the detriment of" interested parties to the litiga-

---

10. Instead of exercising their opportunity to be heard, the Appellants filed the instant appeals in what appears to be yet another attempt to circumvent the Bankruptcy Court's authority.

tion. (Appellees' App. Tab 34, at 42.) In a civil contempt proceeding, a finding of contempt will be upheld so long as the order violated "is clear and unambiguous, the proof of non-compliance [with the order] is clear and convincing, and the contemnor was not reasonably diligent in attempting to comply." *United States v. Local 1804–1, Int'l Longshoremen's Assn.*, 44 F.3d 1091, 1096 (2d Cir.1995).

Appellants' argument, that "no 'clear and unambiguous' order existed from which contempt could lie," completely misses the mark because it deals only with the April 21, 1995 Sale Order. (Appellants' Brief at 28.) Appellants have ignored, whether in error or by design, the Bankruptcy Court's finding that, among other questionable representations and omissions, the "Liquidators admit that they did not comply with the [August 7, 1995] ... Order." (Appellees' App. Tab 34, at 25.) The August 7, 1995 Order was clear and unambiguous on its face, and no party has suggested otherwise.

 The Appellants' noncompliance with the August 7, 1995 Order was admitted, (*id.*), thus the proof of noncompliance with the Order satisfies the "clear and convincing requirement" as well. Most compelling, however, is the Liquidators' *ex parte*[11] motion, filed with the Bahamian Court after the Bankruptcy Court issued the August 7, 1995 Order, seeking to avoid the jurisdiction of the Bankruptcy Court mere days after receiving an adverse ruling from the Bankruptcy Court.[12] There is not one iota of evidence in the record to suggest that Appellants attempted, with any semblance of reasonable diligence, to comply with the August 7, 1995 Order.

Accordingly, the appeal of the September 21, 1995 Order is dismissed because it is not ripe for review. To the extent that this Court has jurisdiction over the Bankruptcy Court's finding that Appellants were in contempt, it is affirmed.

C. Motion to Strike

 Appellees also move to strike materials submitted by the Appellants which are not part of the designated Record on Appeal. Affidavits and other filings not available to the Bankruptcy Court "are not appropriate for consideration on ... appeal of the propriety of the Bankruptcy Court's orders." *In re Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey*, 194 B.R. 728, 733 (S.D.N.Y.1995); *see In re Davis*, 169 B.R. 285, 293 (E.D.N.Y.1994) ("on appeal from an order of the bankruptcy court, the district court should not consider any evidence not before the bankruptcy court at the original hearing"). The Court has discretion to permit supplementation of the record, if the objected material "is relevant to" the Bankruptcy Court's decision. *In re Candor Diamond Corp.*, 30 B.R. 17, 18 (Bankr.S.D.N.Y.1983). In the case at bar, the objected material was filed after the Bankruptcy Court issued the September 21, 1995 Order, and thus is not relevant to the appeals herein. The objected material is, however, relevant to the petition for mandamus. Accordingly, Appellees' motion to strike is GRANTED with respect to the bankruptcy appeals, 95 Civ. 8477 and 95 Civ. 9973, but DENIED with respect to the petition for a writ of mandamus, 97 Civ. 7352.

### III. CONCLUSION

For the forgoing reasons, Appellants' petition for a writ of mandamus is DENIED. The August 7, 1995 Order is AFFIRMED and remains in full force and effect.

---

11. The Bankruptcy Court found that the filing of this *ex parte* motion also violated the terms of the Protocol. (Appellees' App. Tab 34, at 28.)

12. The Court also notes that Rochelle had previously represented to the Bankruptcy Court that the Liquidators and their counsel "certainly" were subject to the jurisdiction of the Bankruptcy Court. (Appellants' App. at 50.)

The appeal of the September 21, 1995 Order is DISMISSED for lack of jurisdiction. To the extent that this Court has jurisdiction to consider the Bankruptcy Court's finding of contempt, the Bankruptcy Court's finding is AFFIRMED.

Appellees' motion to strike is GRANTED in part, DENIED in part. The Clerk is directed to close the docket in 95 Civ. 8477(DAB); 95 Civ. 9973(DAB); and 97 Civ. 7352(DAB).

SO ORDERED.