**PEARL–PHIL GMT (FAR EAST) LTD., Appellant,**

v.

**The CALDOR CORPORATION, et al., Appellees.**

**No. 99 Civ. 11798(RCC).**

United States District Court, S.D. New York.

March 30, 2001.

## OPINION

CASEY, District Judge.

Pearl–Phil GMT (Far East) Ltd. ("Pearl" or "Appellant") appeals, pursuant to 28 U.S.C. § 158(a)(1), from the Memorandum Decision and Order entered November 1, 1999, by the United States Bankruptcy Court for the Southern District of New York ruling in favor of debtor The Caldor Corporation and its affiliates (collectively, "Caldor" or "Appellee"). Pearl argues that the Bankruptcy Court,

Garrity, J., erred in holding that Pearl's claim for damages from Caldor's breach of certain purchase orders "arose" at the time the contracts were entered into, thus meriting only *pro rata* payment. Pearl further argues that it did not receive adequate notice of the Bankruptcy Court's order authorizing the wind-down of Caldor's business operations, and thus the Bankruptcy Court improperly applied the order to Pearl's claim.

## I. BACKGROUND

Prior to the events at issue in this appeal, Caldor was one of the largest discount retailers in the Northeast and Mid–Atlantic states, with 145 stores and approximately $2.5 million in annual sales. On September 18, 1995, Caldor filed a voluntary petition for reorganization under chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.* Caldor continued to operate its business as debtors in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code. By late 1998, however, it had become apparent that Caldor's performance would not enable the company to meet its business plan for that fiscal year. Soon thereafter, Caldor suspended payments to certain trade vendors and declined to receive merchandise for which Caldor had not yet paid. Pearl, an Asian-based vendor who had entered into three purchase orders with Caldor during 1998, was one of the few exceptions to this cancellation.[1]

On January 22, 1999, the Bankruptcy Court conducted an evidentiary hearing on Caldor's emergency application to wind-down its businesses in chapter 11. Caldor had provided notice of its application one day earlier to certain parties.[2] Following

---

**1.** Pearl is one of 18 similarly situated Asian-based vendors (collectively, "Vendors"). The Bankruptcy Court designated Pearl as a test

case for the Vendors, whose claims total approximately $4 million.

**2.** Specifically, Caldor informed (1) counsel to the Official Committee of Unsecured Credi-

the hearing, the Bankruptcy Court issued an order (the "Wind–Down Order") which, *inter alia*, (1) authorized Caldor to wind-down its business operations, (2) restrained Caldor from paying post-petition claims arising before January 23, 1999 (the "Operating Period Claims") and established a bar date for the filing of such claims; and (3) conferred super-priority administrative status upon post-petition claims arising after January 22, 1999 (the "Wind–Down Period Claims"). In other words, while full payment was permitted on the Wind–Down Period Claims, the Operating Period Claims were entitled only to a *pro rata* distribution from the remaining funds.

The Wind–Down Order also provided that a subsequent hearing would be held on February 5, 1999, and directed interested parties to file any objections to the Wind–Down Order three days prior to that date. In order to obtain assistance in serving notice of the Wind–Down Order and Operating Claims bar date on approximately 35,000 entities (including more than 1,000 foreign entities), Caldor contacted its exclusive overseas agents Swire and Maclaine Ltd. and Beldare Enterprises, Ltd. (collectively, "Swire"). Caldor requested from Swire a list of the names and addresses of those foreign vendors with whom Swire was doing business on behalf of Caldor. After receiving the list on February 1, 1999, Caldor's claims agent mailed notice to the named vendors, including Pearl, on that same day. Caldor also published notice of the Operating Claims bar date in *The New York Times* and *Women's Wear Daily*.

According to Pearl's manager, Pearl did not receive the notice materials until March 1, 1999. In the meantime, the Bankruptcy Court held hearings on February 5 and 8, 1999, and reaffirmed the Wind–Down Order. The Bankruptcy Court concluded that the bifurcation of post-petition claims was necessary because it was unreasonable to expect suppliers of goods and services to do business with Caldor during the Wind–Down Period without granting them super-priority status. On February 17, 1999, Caldor instructed Swire to cancel all outstanding purchase orders, which included those with Pearl. Thereafter, on March 31, 1999, Pearl, as part of a committee of Vendors, filed a motion seeking payment of its claim as an administrative expense.[3] Pearl argued that it was entitled to payment in full because its claim arose at the time when Caldor breached the purchase orders in February, and thus must be considered a Wind–Down Period Claim. Moreover, in its reply papers filed on July 30, 1999, Pearl argued that even if its claim arose prior to the Wind–Down Period, the Wind–Down Order could not apply because Pearl did not receive adequate notice thereof.

The Bankruptcy Court conducted an evidentiary hearing on Pearl's motion on August 11 and 12, 1999. Two months later, the Bankruptcy Court issued a Memorandum Decision holding that Pearl's claim arose at the time when the purchase orders were entered into in 1998 and that Pearl was not deprived of due process. *In re Caldor, Inc.-NY*, 240 B.R. 180 (Bankr. S.D.N.Y.1999). Consequently, the Bankruptcy Court denied Pearl's application for payment in full and directed that Pearl's claim be paid on a *pro rata* basis with

tors; (2) counsel to the Official Committee of Equity Security Holders; (3) counsel to the Secured Debt Holders; (4) counsel to the Post–Petition Lenders; and (5) the United States Trustee.

3. Caldor concedes that Pearl's claim is entitled to administrative expense priority under 11 U.S.C. §§ 503(b) and 507(a)(1).

other Operating Period claims. *Id.* at 195. Pearl now appeals.

## II  DISCUSSION

■ This Court reviews the legal conclusions of the Bankruptcy Court *de novo. National Union Fire Ins. Co. v. Bonnanzio (In re Bonnanzio),* 91 F.3d 296, 300 (2d Cir.1996). Findings of fact are reviewed under a clearly erroneous standard. *Id.;* Fed. R. Bankr.P. 8013. Deference is given to the Bankruptcy Court's factual determinations because of its "expertise and superior position to make determinations of credibility." *In re Commodore Bus. Mach.,* 246 B.R. 476, 487 (S.D.N.Y.2000). The Bankruptcy Court's choice between two permissible views of the facts cannot be held to be clearly erroneous. *Id.* (citing *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985)).

### A.  *When Pearl's Claim "Arose"*

■ Pearl argues that the Bankruptcy Court erred in holding that Pearl's claim "arose" when the purchase orders were entered into rather than at the time of the breach, thus meriting only *pro rata* payment as an Operating Period Claim. Pearl contends, *inter alia,* that the Bankruptcy Court's decision disregarded controlling precedent and improperly applied federal common law rather than state law. For the reasons set forth below, this Court concludes that the Bankruptcy Court correctly applied the relevant law and affirms.

■ The Bankruptcy Court held, and Pearl does not dispute, that Pearl's administrative expense must fall within the definition of a "claim" before it can be deemed to arise. Section 101(5) of the Code defines a "claim" as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed,

undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5). Congress intended the term "claim" to have "the broadest possible definition ... [including] all legal obligations of the debtor, no matter how remote or contingent." H.R.Rep. No. 95–595, at 649 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963. It has been recognized that this broad definition "performs a vital role in the reorganization process by requiring, in conjunction with the bar date, that all those with a potential call on the debtor's assets, provided the call in at least some circumstances could give rise to a suit for payment, come before the reorganization court so that those demands can be allowed or disallowed and their priority and dischargeability determined." *In re Kings Terrace Nursing Home & Health Related Facility,* 184 B.R. 200, 204 (S.D.N.Y.1995) (citing *United States v. LTV Corp. (In re Chateaugay Corp.),* 944 F.2d 997 (2d Cir.1991)). In this way, the debtor is provided with the opportunity for a fresh start.

■ The Bankruptcy Court determined that a contingent claim arose when the purchase orders were executed. *In re Caldor,* 240 B.R. at 191–92. Although the Bankruptcy Code itself does not define the term contingent, the Second Circuit has held that a claim is contingent "if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event." *Mazzeo v. United States (In re Mazzeo),* 131 F.3d 295, 303 (2d Cir.1997). Moreover, the future event must have been "within the actual or presumed contemplation of the parties at the time the original relationship between the parties was created." *In re Chateaugay Corp.,* 944 F.2d at 1004 (citations omitted).

■ Certainly the possibility of a future breach is within the presumed contemplation of the contracting parties. *See In re*

*Russell,* 193 B.R. 568, 571 (Bankr.S.D.Cal. 1996) ("It is within the fair contemplation of the parties entering into a contract that the other party may breach it, or have made representations to induce the making of the contract. Thus, a contingent claim arises at that point in time, although it may never mature."); *see also In re Emelity,* 251 B.R. 151, 156–57 (Bankr. S.D.Cal.2000). If this were not so, all contract provisions governing remedies in the event of a breach would be superfluous. Indeed, Pearl must acknowledge that a breach of the purchase orders was actually contemplated in its case, because any risk of nonpayment was planned to be covered by letters of credit. Pearl Br. at 28 n. 36.

Pearl attempts to avoid the conclusion that it had a contingent claim by referring back to the language of § 101(5) and focusing on the term "right to payment." In order to define that term, Pearl cites *Pennsylvania Dep't of Welfare v. Davenport,* 495 U.S. 552, 110 S.Ct. 2126, 109 L.Ed.2d 588 (1990), for the proposition that a "right to payment" must be an "enforceable obligation." Pearl then argues that the Bankruptcy Court failed to look to state law in determining when an enforceable obligation arises. Pearl reads the Uniform Commercial Code to state that an obligation arising under a contract is not enforceable until either (1) performance by one party had constituted consideration for performance by another; (2) one party breaches or anticipatorily repudiates such performance; or (3) it is a unilateral contract. Pearl Br. at 13 (citing N.Y.U.C.C. §§ 2–610 & 2–703).

■ Pearl's invocation of the Uniform Commercial Code is inappropriate here. First, it is well-settled that the Bankruptcy Code governs *when* a claim arises. *See Siegel v. Federal Home Loan Mortgage Corp.,* 143 F.3d 525, 532 (9th Cir.1998)

("The question of when a debt arises under the bankruptcy code is governed by federal law.") (citing cases); *see also Federated Dep't Stores v. Wongco (In re R.H. Macy & Co.),* 236 B.R. 583, 589 (Bankr.S.D.N.Y. 1999); *Riverwood Int'l Corp. v. Olin Corp. (In re Manville Forest Prod. Corp.),* 225 B.R. 862, 866 (Bankr.S.D.N.Y.1998); *In re Nat'l Gypsum Co.,* 139 B.R. 397, 405 (N.D.Tex.1992). Thus the Bankruptcy Court properly focused on federal bankruptcy law.

■ Moreover, Pearl's entire argument is based upon a misreading of *Davenport.* As Pearl itself acknowledges, under *Davenport* a claim need not be a *presently* enforceable obligation. *See Davenport,* 495 U.S. at 558–59, 110 S.Ct. 2126; *see also* Pearl Br. at 18. Even though non-bankruptcy law may not recognize a claim absent a breach, the Bankruptcy Code, as discussed above, employs a broader approach. Thus, under the Code, a right to payment need not be currently enforceable in order to constitute a claim. *See Riverwood,* 225 B.R. at 866 ("Because contingent and unmatured rights of payment are 'claims' under the Code, it is possible that a right to payment that is not yet enforceable at the time of the filing of the petition under non-bankruptcy law, may be defined as a claim within section 101(5)(A) of the Code."); *see also Kilbarr Corp. v. Gen. Servs. Admin. Office (In re Remington Rand Corp.),* 836 F.2d 825, 832 (3d Cir. 1988) ("a party may have a bankruptcy claim and not possess a cause of action on that claim"). The Bankruptcy Code's more inclusive definition of a claim makes perfect sense in light of the Code's design to provide for a comprehensive discharge of liabilities so that the debtor may reorganize effectively. If bankruptcy claims did not arise until breach, the debtor could be faced with lingering liabilities well after reorganization.

Pearl next argues that a contingent claim cannot exist unless the contingency is extrinsic to the contract. Pearl purports to cull this requirement from language in *Mazzeo,* 131 F.3d at 303, and *In re All Media Properties, Inc.,* 5 B.R. 126, 133 (Bankr.S.D.Tex.1980), *aff'd* 646 F.2d 193 (5th Cir.1981). However, the term "extrinsic" was not relevant to the holding of those cases and was never defined. In fact, other cases in this Circuit do not mention the term at all, but rather define contingent claims as obligations that become due upon the happening of a future event. *See Big Yank Corp. v. Liberty Mut. Fire Ins. Co. (In re Water Valley Finishing, Inc.),* 139 F.3d 325, 328 (2d Cir.1998) ("Under contract law, an 'unmatured' or 'contingent' claim refer[s] to obligations that will become due upon the happening of a future event that was 'within the actual or presumed contemplation of the parties at the time the original relationship was created.'"); *see also In re Chateaugay,* 944 F.2d at 1004 (same). As discussed above, a potential future breach was within Pearl's contemplation at the time the purchase orders were executed. The Bankruptcy Court therefore did not err when it determined that Pearl had a contingent claim that arose at the time it entered into the purchase orders, and that would have remained contingent until performance or breach. *In re Caldor,* 240 B.R. at 191–92.

The Bankruptcy Court's conclusion is supported by the clear weight of case law in this Circuit which recognizes that contract-based bankruptcy claims arise at the time the contract is executed. For example, courts consistently hold that a post-petition breach of a pre-petition contract gives rise only to a pre-petition claim. *In re Riodizio, Inc.,* 204 B.R. 417, 424 n. 6 (Bankr.S.D.N.Y.1997) (citing cases); *see also In re Episode USA, Inc.,* 202 B.R. 691, 696 (Bankr.S.D.N.Y.1996) ("Landlord's administrative priority claim cannot be predicated on the guaranty agreement because both the lease and guaranty were executed pre-petition and the liabilities arising therefrom were fixed at that time."); *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 138 B.R. 687, 696 n. 12 (Bankr.S.D.N.Y.1992) ("Where the debtors' obligations stem from contractual liability, even a post-petition breach will be treated as a prepetition liability where the contract was executed prepetition."); *In re Chateaugay Corp.,* 102 B.R. 335, 351 (Bankr.S.D.N.Y.1989) (same), *aff'd,* 875 F.2d 1008 (2d Cir.1989), *rev'd on other grounds,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).[4]

Even though the case at bar involves a rather uncommon division between Operating and Wind–Down Period Claims, the above cases are instructive here. Post-petition claims are distinguished from pre-petition claims and accorded greater priority because it would be unreasonable to expect persons and entities to do business with a debtor during the reorganization period without certain protections. *See, e.g., Klein Sleep,* 78 F.3d at 20. This rationale also applies to the bifurcation of administrative claims into Operating Period Claims and Wind–Down Period Claims. Section 364 of the Code empowers the

---

4. Pearl misreads the Second Circuit's decision in *Nostas Assocs. v. Costich (In re Klein Sleep Products, Inc.),* 78 F.3d 18 (2d Cir.1996) ("*Klein Sleep*"), to hold that a post-petition claim arises at the time a contract is breached. To the contrary, *Klein Sleep* merely determined that the rejection of a lease assumed post-petition yields an administrative claim. Indeed, the Second Circuit held that "claims for future rent arising out of assumed leases are administrative expenses of the debtor's estate, *regardless of whether they are subsequently rejected . . . .*" *Id.* at 30 (emphasis added).

Bankruptcy Court to allow new debts to take priority over other administrative expenses. 11 U.S.C. § 364(c). The Bankruptcy Court utilized its power under that statute to grant super-priority status to the Wind–Down Period Claims in order to allow Caldor to effectively wind-down its operations in chapter 11. Judge Garrity determined that it was unreasonable to expect suppliers of goods and services to do business with Caldor during the Wind–Down Period without granting them super-priority status. *In re Caldor,* 240 B.R. at 184. Thus, the Bankruptcy Court's bifurcation of post-petition claims at bottom is based upon the same reasoning that governs the separation of pre- and post-petition claims. The Bankruptcy Court therefore properly invoked the case law discussed above and correctly determined that Pearl's claim arose during the Operating Period. The Bankruptcy Court's decision on this point is hereby affirmed.

### B. *Due Process*

■■■■■ Pearl contends that it did not receive constitutionally adequate notice of the Wind–Down Order, and thus the Wind–Down Order may not be applied to its claim. The Supreme Court has held that due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank & Trust,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). "The proper inquiry is whether the [noticing party] acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice." *Weigner v. City of New York,* 852 F.2d 646, 649

(2d Cir.1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 785, 102 L.Ed.2d 777 (1989). Adequacy of notice is always evaluated by reference to the surrounding context; whether a particular method of notice is reasonable depends on the particular circumstances involved. *United States v. One Toshiba Color Television,* 213 F.3d 147, 153 (3d Cir.2000) (en banc). Moreover, even if notice was inadequate, the objecting party must demonstrate prejudice as a result thereof. *Rapp v. United States Dep't of Treasury,* 52 F.3d 1510, 1520 (10th Cir.1995); *In re Vanguard Oil & Serv. Co.,* 88 B.R. 576, 580 (E.D.N.Y. 1988).

■■■■ Pearl argues that it was not notified of the January 22, 1999, hearing and did not receive adequate notification of the February 5, 1999, proceeding. Although it is undisputed that Pearl did not receive notice of those hearings, the focus of the inquiry is on whether Caldor acted reasonably. Here, Caldor acknowledges it did not provide Pearl with notice of the January hearing on its emergency application. However, the Bankruptcy Court scheduled a subsequent hearing on February 5, 1999, at which all interested parties could challenge the Wind–Down Order free from the strictures governing a motion for reargument or reconsideration. *In re Caldor,* 240 B.R. at 183. Caldor was then faced with the formidable task of providing notice to approximately 35,000 entities. Because Caldor did not deal directly with its foreign vendors, it requested a list of those entities from Swire. On February 1, 1999—the same day Swire provided the list—Caldor's claims agent served Pearl by mail. Caldor's actions are reasonable given the circumstances under which it was operating.[5]

---

**5.** The record of the January and February hearings is replete with evidence as to Caldor's dire financial circumstances.

■ Even if Caldor's actions were unreasonable, however, Pearl does not show that it suffered any prejudice as a result thereof. Pearl was afforded an opportunity to contest the Wind–Down Order and its subsequent affirmance at the August hearing. As noted by the Bankruptcy Court, Pearl did not introduce testimony or other evidence refuting any factual finding by the Bankruptcy Court in entering those orders. *Id.* at 188 n. 6. Instead, Pearl argued that the Wind–Down Order did not comport with Rule 4001 of the Federal Rules of Bankruptcy Procedure, which provides that a Bankruptcy Court "may commence a final hearing on a motion for authority to obtain credit no earlier than 15 days after service of the motion." Fed. R. Bankr.P. 4001(c)(2). The Bankruptcy Court determined that "[g]iven the unique exigencies of the case, Caldor's dire need to obtain credit during the Wind–Down Period and the benefit to all Operating Period creditors from the implementation of the procedures in the Wind–Down Order ... debtors' failure to strictly comply with Rule 4001 does not invalidate the order." *In re Caldor,* 240 B.R. at 189. Moreover, with respect to Pearl's claim, the "final hearing" did not occur until August, when the Bankruptcy Court permitted Pearl to further object to the imposition of the Wind–Down Order. Consequently, Pearl suffered no prejudice from its initial lack of notice of the Wind–Down Order nor from any technical violation of Rule 4001.

■ Pearl also argues that the Bankruptcy Court improperly engaged in judicial law-making by granting super-priority status to the Wind–Down Period Claims. However, the Bankruptcy Court's decision to bifurcate the claims is consistent with section 364 of the Bankruptcy Code, which provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-
>
> (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) ....

11 U.S.C. § 364(c)(1). The Bankruptcy Court found that, because Caldor's estates were administratively insolvent, no third party would provide services or extend credit to Caldor except on a super-priority basis. *In re Caldor,* 240 B.R. at 189. Given the situation, the Bankruptcy Court acted within its powers under section 364 to accord super-priority status to the Wind–Down Period Claims. Moreover, the Bankruptcy Court's approach was not entirely novel. In *Klein Sleep,* the bankruptcy judge separated administrative claims arising while the debtor was operating from "burial expenses" arising during the wind-down period. *See In re Klein Sleep Prods., Inc.,* 173 B.R. 296, 297–98 (S.D.N.Y.1994), *rev'd in part,* 78 F.3d 18 (2d Cir.1996).[6] As in *Klein Sleep,* Judge Garrity determined that it was in the best interest of all parties to facilitate the liquidation of the Caldor estates by bifurcating the administrative claims in a similar manner. *In re Caldor,* 240 B.R. at 190.

Pearl therefore has not established that its due process rights were violated so as to justify reversal of the Bankruptcy Court's decision. Moreover, it is questionable whether Pearl suffered an actual deprivation of property here. Because Caldor's estates are insolvent, Pearl would have received only a *pro rata* share of the available assets even if the Bankruptcy Court had vacated the Wind–Down Order. *Id.* at 190 n. 10. Alternatively, if the Bank-

---

**6.** The bifurcation issue was not raised on appeal to the Second Circuit.

ruptcy Court had converted Caldor's chapter 11 cases to chapter 7, Pearl again would have been entitled only to *pro rata* payment.[7]  Thus, even absent the Wind–Down Order, Pearl would not have garnered full payment on its claim.

## III.  CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is affirmed.  The Clerk of the Court is directed to close this case.

7.  As the Bankruptcy Court noted, it is undisputed that by effectuating the Wind–Down program in chapter 11, Caldor was able to realize significantly more on its assets than if the cases had been converted to chapter 7 liquidations.  *Id.* at 184.